IN THE MATTER OF THE ESTATE OF ABRAHAM B.
SPIEGELGLASS, DECEASED.

KATHRINE L. SPIEGELGLASS, PLAINTIFF-RESPONDENT,
v. H. LAWRENCE SPIEGELGLASS, JR. AND JAMES B.
SPIEGELGLASS, BY JAMES A. MAJOR, THEIR GUARD-
IAN *AD LITEM*, DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued December 9, 1957—Decided January 7, 1958.

Before Judges CLAPP, JAYNE and SCHETTINO.

*Mr. William V. Breslin* argued the cause for plaintiff-respondent.

*Mr. James A. Major* argued the cause as guardian *ad litem, pro se.*

The opinion of the court was delivered by

CLAPP, S. J. A. D. This is an action for the probate of the will of Abraham B. Spiegelglass. The question of interest in the case is whether evidence of a statement made by him some time after he had, with a pencil, scratched out certain names in his will, may be admitted to show that at the time he did this, he had no intention to revoke the entire will. The Bergen County Court, Judge Vanderwart sitting, held that these pencil markings were not placed on the instrument *animo revocandi,* and accordingly it probated the instrument as originally executed. Two infant grandchildren of the testator appeal, contending, through their guardian *ad litem,* that the will had been revoked.

By the terms of the will, the testator gave his entire estate to his wife and appointed her his executrix, provided she survived him, *which she did.* The will went on to state that in the event she were to predecease him, his daughter, Harriet Frank, and his son, H. Lawrence Spiegelglass, were to receive his estate and be his executors; and if either child predeceased the testator, his share was to go to his issue.

Lawrence died subsequent to the making of the will but 11 months before the testator's death, leaving surviving his wife, Edith Spiegelglass, and their two infant sons who take this appeal. Nine months after Lawrence's death and two months before the testator's death, the latter delivered the will to his attorney with the above-stated pencil lines and also a pen line upon it, all admittedly placed there by the testator. He had struck pencil lines through Lawrence's name, both in the dispositive and the executorial clauses, and also through the signature of Edith who was one of the witnesses of the will. The only line drawn in ink ran through the words "my son," appearing in one clause, which added nothing to the effect of the will. It would be idle to speculate whether the testator had drawn his pen through these two words definitively and then desisted from making any other definitive changes.

Our statute, *N. J. S.* 3*A*:3–3, in this respect drawn literally from the statute of frauds, 29 *Car.* 2, *c.* 3, § 6, declares that a will may be revoked by "burning, canceling, tearing or obliterating the same." We may assume, without deciding the matter or stopping to discuss it, that the pencil and ink lines on the instrument, in particular the line through Edith's signature, a vital part of the will, constitute the revocatory act required by the statute for the revocation of an entire will.

 Appellants then insist that since the testator intentionally drew these cancellatory lines upon the instrument, knowing it to be his will, he had *ipso facto* revoked it, though he had no intention to do so. The case cited for that proposition on the oral argument, *In re Bakhaus' Estate,* 410 *Ill.* 578, 102 *N. E.* 2*d* 818 (*Sup. Ct.* 1951), does not sustain it. On the contrary, the court there refers to an Illinois decision as holding that "even though one of the requisite methods of revocation is followed by the testator, the act is ineffectual unless there is an intent to revoke the will." It is true that in our statute (and the Illinois statute, too), unlike the English Wills Act of 1837, 7 *Will.* 4 & 1 *Vict., c.* 26, and the statutes in this country following it, no provision will be found expressly requiring an intention to revoke. Nevertheless the cases have laid such a requirement upon the statutory law; "[t]o effect a revocation there must be a present intent to do so." *Heise v. Earle,* 134 *N. J. Eq.* 393, 403 (*E. & A.* 1944). In accord see *Frothingham's Case,* 76 *N. J. Eq.* 331 (*E. & A.* 1909). There can be no revocation, unless there be both the act demanded by the statute and the intention stated. The law thus bends to the testator's wishes—and quite properly so, regardless of the difficulties that may be encountered in securing adequate proof of those wishes.

The case then comes down to this: did Abraham B. Spiegelglass, when he struck through Lawrence's name and Edith's signature, in pencil, intend to destroy the validity of the will? The alleged revocatory act may sometimes

furnish very inconclusive evidence as to the testator's purposes, and at other times, it may itself constitute strong proof of an intention to revoke the entire instrument, as, where the testator cuts his signature from the will with a pair of scissors. *Smock v. Smock,* 11 *N. J. Eq.* 156, 162 (*Ch.* 1856); *cf. In re While's Will,* 25 *N. J. Eq.* 501, 502 (*Prerog.* 1874); *Board of National Missions of Presbyterian Church v. Sherry,* 372 *Ill.* 272, 23 *N. E. 2d* 730, 732 (*Sup. Ct.* 1939).

Here, however, the act is equivocal, especially when viewed in the light of the surrounding circumstances. Thus, from the testimony of testator's attorney, insofar as it seems to rest, in a substantial way, upon the attorney's own observations (as distinguished from what he was told by the testator), it appears that family difficulties had arisen between the testator, on the one hand, and Edith and in particular one of her sons, on the other hand, and that as a result, after Lawrence's death, the testator had entered into a settlement with her as to certain matters, in which settlement his attorney had participated. Having these circumstances in view, it may without much difficulty be inferred that the lines through Lawrence's name were intended to affect only the contingent gifts to Edith's sons; it could hardly be said that these lines were designed to revoke the entire will. Nor do the lines through the signature of Edith, with whom the testator was displeased, satisfactorily indicate such a design. If his purpose was thereby to revoke the instrument, why had he not stricken the signature of both witnesses? Without going further into the case, one seems to be confronted with doubts as to what was his true intent here.

■■ The burden of proving a revocation rests on those who assert it. What, however, is the measure of their proof? In 1837, the English tightened and recast the terms of the statute of frauds, "burning, canceling, tearing or obliterating," substituting therefor the clause "burning, tearing, or otherwise destroying," 7 *Will.* 4 *&* 1 *Vict., c.* 26, § 20—doubtless with a view to the elimination of controversies,

such as the very one before us, provoked by cancellatory lines drawn through parts of the will (or other revocatory acts affecting parts thereof), with no mark on the instrument manifestly designed to destroy the entire will. Our practice, however, has in a manner, compensated for our somewhat loose statutory provision by requiring, in any event in the case of such dubious cancellations, that the intent to revoke must be clear and unequivocal. *Cf. Heise v. Earle,* 134 *N. J. Eq.* 393, 403 (*E. & A.* 1944); *Throckmorton v. Holt,* 180 *U. S.* 552, 584, 21 *S. Ct.* 474, 45 *L. Ed.* 663, 678 (1901). Accordingly if the circumstances here leave the issue clouded and substantially in doubt, the infant contestants cannot succeed.

The doubts, above stated, as to whether the testator intended to revoke the entire will, may perhaps of themselves justify a finding that the burden of proof has not been met here. But the whole case can be much more satisfactorily resolved (though we will be brought back to the same conclusion), if we are permitted to take into account statements of the testator uttered in the course of a conversation between himself and his attorney which occurred when he delivered to the attorney the will with the lines drawn through Edith's signature and his deceased son's name. As related by the attorney, the conversation ran as follows:

"* * * [the testator] wanted to make certain that the children of his son would not receive any benefits from any will of his. He stated * * * that he did not want to change [the provisions for his wife] * * * It was only the contingent clauses that were to be changed * * * He then handed me the will, and about that time I said to him, 'Now, do you wish this will to be destroyed with these markings on it?' He said, 'No.' He said, 'But I'm not feeling so well now, I want to think it over.' And he said, 'I'll be in touch with you.' I said, 'If you wish to destroy the will I would suggest that you tear your signature off.' He said, 'I want this will to stay as it is, because the will is perfectly all right. If I die before my wife, then that's the way I wish my property to go.' He then delivered the will to me and told me to keep it until a new will was executed, and that I was not to destroy it.

* * * [In the course of the conversation] I discussed * * * with him [the advisability of having the document retyped], but

I advised him at the same time, that *as long as he intends to change only the contingent beneficiaries* this will was legally good." (Italics added)

No objection was taken below to the admission of any of this testimony. It might be observed that no serious question is raised on the appeal as to whether these communications between attorney and client were privileged, and we do not consider the matter. *Cf.* 8 *Wigmore, Evidence* (3d ed.), §§ 2314, 2315, 2329. However it is strenuously insisted on the appeal that the admission of this testimony constituted a violation of the hearsay rule, so flagrant and prejudicial to the interests of the infant contestants as to amount (as stated on the oral argument) to plain error. *R. R.* 1:5–3(c). We have decided to pass on the effect of the hearsay rule here.

It will be noted from the foregoing testimony that the testator entered this conference with his attorney with a plan "to change only the contingent beneficiaries" and that his decision at the conference was to have the will "stay as it is," for the time being, and have his attorney "keep it" without destroying it, thereby providing for his wife, who was his primary concern. The evidentiary question is this: are his declarations, disclosing a plan *only* to change the contingent provisions of the will and a decision not to destroy the other provisions, admissible to show that he was of the same state of mind when he struck lines in pencil through Edith's signature and Lawrence's name?

It is, of course, settled law that by way of exception to the hearsay rule, a person's state of mind may be established by his contemporaneous declarations. They furnish the court with a valuable form of evidence, under some circumstances the best proof that can be had, as to what he was thinking at the time; their value lies simply in this, that they are current expositions of his thoughts. 6 *Wigmore, supra,* § 1714. The point was stated thus in the leading case of *Mutual Life Ins. Co. of New York v. Hillmon,* 145 *U. S.* 285, 12 *S. Ct.* 909, 912, 36 *L. Ed.* 706, 710 (1892):

"* * * A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. * * *

The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it, and while he is still alive, his own memory of his state of mind at a former time is no more likely to be clear and true than a by-stander's recollection of what he then said, * * *.

* * * * * * * *

The rule applicable to this case has been thus stated by this court: 'Wherever the bodily or mental feelings of an individual are material to be proved, the usual expression of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect.' "

■ There is, as it has been said, a certain degree of permanency, or rather a certain probability of continuity, in a person's state of mind. *Rusling v. Rusling,* 36 *N. J. Eq.* 603, 608 (*E. & A.* 1883); but *cf. In re Allen's Will,* 88 *N. J. Eq.* 291, 295 (*Prerog.* 1917), affirmed 89 *N. J. Eq.* 208 (*E. & A.* 1918). Accordingly, it is settled that proof of an intention to do an act at one point of time is admissible to show the persistence of that intention at a subsequent point. *State v. Ready,* 78 *N. J. L.* 599 (*E. & A.* 1910). Indeed, it is admissible to show that he who held the intention, later did the act. *State v. Ready, supra; Schloss v. Trounstine,* 135 *N. J. L.* 11, 14 (*Sup. Ct.* 1946); *State v. Pisano,* 33 *N. J. Super.* 559, 562 (*App. Div.* 1955).

■ This continuity in a person's views also constitutes the foundation for admitting into evidence the testimony now under consideration—that is, testimony as to a person's declarations disclosing his then state of mind for the purpose of showing his state of mind at some previous time. It should not be overlooked that the continuity we speak of is subject to a certain limitation in point of time. Accordingly, where a declaration is offered in order to show a previous state of mind, the court is invested with a dis-

cretion to refuse to admit the evidence where because of the circumstances and the interval between the time of the declaration and the previous time referred to, it concludes that there is no reasonable basis for finding such a continuity. *Cf. Brinson v. Hernandez,* 24 *N. J.* 391 (1957); *Model Code of Evidence, Rule* 1 (12).

In any of the above situations, proof as to a declaration revealing the declarant's existing state of mind is admissible even though he is available to testify. See the passage above quoted from *Mutual Life Ins. Co. of New York v. Hillmon, supra;* 6 *Wigmore, supra,* § 1714. However, where, as here, he is unavailable, there is added justification for admitting the proof. (Indeed, although our law has not taken this step, it might be noted that one of the major proposals for the reform of the hearsay rule, which has received much approbation, calls for the admission of *any* hearsay declaration, if the declarant is unavailable. *Model Code of Evidence, Rule* 503(*a*); 5 *Wigmore, supra,* § 1576; *McCormick, Evidence,* § 271, §§ 300–305 (1954); and the authorities cited in *Wigmore* and *McCormick; Robertson v. Hackensack Trust Co.,* 1 *N. J.* 304, 315 (1949), C. J. Vanderbilt's much cited dissenting opinion; *In re Petagno,* 24 *N. J. Misc.* 279, 286 (*Ch.* 1946)).

The authorities from other jurisdictions overwhelmingly support the above-stated conclusions. 6 *Wigmore, supra,* § 1737; *McCormick, supra,* 569; 2 *Morgan, Basic Problems of Evidence* 294 (1954); *Model Code, Rule* 513, and particularly *comment* (*a*); *Uniform Rules of Evidence* 63 (12); *Annotation, "Admissibility of Declarations by Testator on Issue of Revocation of Will,"* 79 *A. L. R.* 1493, 1503 (1932); 172 *A. L. R.* 354, 359 (1948); 2 *Page, Wills* (*3d ed.*), § 880.

The only question presented by the New Jersey cases with respect to these conclusions arises in connection with the testimony now before us, namely, whether testimony as to declarations of a person disclosing his then state of mind, is admissible to show a prior state of mind. However, even on that point there is authority in this State in accord with the view entertained elsewhere. *Speer v.*

*Speer,* 14 *N. J. Eq.* 240, 248 (*Ch.* 1862); *Rusling v. Rusling,* 36 *N. J. Eq.* 603, 607, 608 (*E. & A.* 1883); *Skillman v. Wiegand,* 54 *N. J. Eq.* 198 (*Ch.* 1896); *O'Neal v. O'Neal,* 9 *N. J. Super.* 36, 41 (*App. Div.* 1950). But *cf. Dill v. Dill,* 118 *N. J. Eq.* 374, 376 (*Ch.* 1935), affirmed 119 *N. J. Eq.* 467 (*E. & A.* 1936); *Stiles v. Newschwander,* 140 *N. J. Eq.* 591, 596 (*E. & A.* 1947); *Veader v. Veader,* 89 *N. J. L.* 399 (*Sup. Ct.* 1916). Thus in *Rusling v. Rusling, supra,* Justice Dixon for the Court of Errors and Appeals said:

Undue influence "involves two things: first, the conduct of those by whom the influence is said to have been exerted; second, the mental state of the testator, as produced by such conduct, which may require a disclosure of the strength of mind of the decedent and *his* testamentary *purposes,* both immediately before the conduct complained of, and while subjected to its influence. In order to show the testator's mental state at any given time, his declarations at that time are competent, because the conditions of the mind are revealed to us only by its external manifestations, of which speech is one. *Likewise, the state of the mind at one time is competent evidence of its state at other times not too remote, because mental conditions have some degree of permanency.* Hence in an inquiry respecting the testator's state of mind, before or pending the exertion of the alleged influence, his words, as well as his other behavior, may be shown for the purpose of bringing into view the mental condition which produced them, and, through that, the *antecedent* and subsequent [mental] conditions." (Italics added)

Proof as to the testator's declarations to his attorney here is therefore admissible. We have dealt with this matter, as the cases generally seem to do, as though we were obliged to rely on this exception to the hearsay rule. It might be noted, however, that according to Wigmore and others, no such question is presented here; they argue that declarations, such as those before us, are not even hearsay since they are not offered directly to prove the truth of any assertion made therein. 6 *Wigmore, supra,* §§ 1715, 1788; *McCormick, supra,* 547. They are offered, it is claimed, just circumstantially to establish the inference that he never intended to revoke the entire will.

The distinction is not too valuable. For it is obvious, of course, that in drawing this inference from the testator's declarations we do not escape all the dangers of hearsay; thus, for one thing, when he made the declarations he was not subject to cross-examination with respect to the validity of the inference. On the other hand, the inference is not direct, but oblique; and the more oblique it is, the greater the likelihood that it is ingenuous and reliable, and not the product of either some artful dissimulation or even the guileless process of polishing the fact, that seems to take place commonly in the mind of anyone relating a story. In any event, since under the above-stated exception to the hearsay rule, evidence as to a declaration demonstrative of a present state of mind is generally admissible as proof of a previous state of mind, *a fortiori* such evidence is admissible when it furnishes merely circumstantial proof of it.

The conversation here between the testator and his attorney is by no means conclusive on the issue as to what was in the testator's mind when he scratched his pencil through Lawrence's name and Edith's signature. However, it does strengthen the view, tentatively broached above, that the contestants have not established, free from any substantial doubt, an intent on the part of the testator to revoke the entire will.

The judgment below, giving effect to the will as originally executed, probates the clauses that were to be operative only if the testator's widow predeceased him. However, since she has survived and since therefore these clauses are ineffective, appellants are not prejudiced by error, if any, in that respect.

Affirmed.