[Crim. No. 11877. In Bank. June 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHNNY BOCKTUNE LEW, Defendant and Appellant.

Cooper & Nelsen, Ned R. Nelsen and Richard M. Moore for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—Defendant Johnny Bocktune Lew appeals from a judgment of conviction entered upon a jury verdict finding him guilty of second degree murder. He contends that the trial court erroneously allowed into evidence certain hearsay statements to show the state of mind of the victim, Karen Gervasi, at the time of her death. We have concluded that the statements should not have been admitted, and, since the error was plainly prejudicial, the judgment must be reversed.

The facts are not in dispute. Defendant, though married, had for some time been enamored of Karen; they were sexually intimate, and there was some contemplation of marriage. On the day Karen died defendant had picked her up at her parents' house with the knowledge of and without objection from her parents. The defendant and Karen were in a gay mood. They completed some errands and then drove to defendant's apartment. On the way, according to defendant, Karen noticed some earmuffs which he explained were designed to protect the wearer's ears from the repeated concussion of weapons fired at a pistol range. Although other evidence adduced at trial showed that Karen had an aversion to firearms, defendant testified that the earmuffs naturally led into a conversation about guns, and Karen expressed a desire to fire defendant's pistol. He agreed to take her to a pistol range, and they stopped at his apartment to get the gun. As they entered, a neighbor observed Karen's carefree demeanor and testified that she appeared to proceed voluntarily.

Inside the apartment, according to defendant, they sat on the couch and looked at some pictures through a slide viewer. Defendant then retrieved the gun from another room, and sat down in an overstuffed chair in the living room. Karen sat on his left side, partly in his lap and partly on the arm of the chair. Defendant released the clip from the gun with his right hand while his left arm was partially around Karen's shoulder. He then handed Karen the gun, probably with his right hand, while at the same time he took the viewer from Karen's left hand. The clip fell to the floor, and as he bent over to pick it up he heard a shot. The bullet struck Karen in the left temple just above her eye. Defendant became hysterical when he discovered that Karen was no longer breathing, and placed her on the floor to administer mouth-to-mouth resuscitation. She then began to breathe but remained unconscious.

Defendant further testified that he wanted to call the police and obtain an ambulance, but could not recall the telephone

number and instead called his wife at work and requested that she come home, stating that there had been an accident. He then called the operator and gave her the information, asking that she call the police and summon an ambulance. Upon their arrival the police found defendant standing on the stairway in front of his apartment motioning for them to hurry. Karen was lying on her back and bleeding profusely around the head. She was still alive and momentarily regained consciousness, but was unable to relate the events in the apartment. She died a short time later in a hospital.

There was no evidence of a struggle. To determine whether defendant had fired the fatal shot, the police required him to submit to paraffin tests on his hands. These tests were inconclusive: some traces of nitrates were present, but they were not located where one would have expected had defendant in fact fired the gun. There was no trace of nitrates on defendant's right hand, for example, even though he is right-handed. It was conceded that the nitrate deposits on his left hand could have come from other common sources; no nitrates were found on Karen's hands. Finally, the autopsy surgeon testified that it was impossible for him to state that death was not caused accidentally.

Defendant consistently maintained that Karen's death was the result of an accident. His detailed version of the events leading up to the fatal shot in the interview with investigating officers preceding his arrest did not vary in significant respect from his testimony at trial. Under these circumstances certain hearsay statements undoubtedly played a major role in the jury's deliberations.

These hearsay statements, all introduced into evidence over objection, were confidential remarks made by Karen to various friends. Five witnesses (Professor Resch, Dale Moore, Diane Ijames, Patricia Mullen, and Leslie Sautter) testified that Karen told them defendant had threatened to kill her. Professor Resch and Dale Moore declared that Karen also told them defendant had threatened to harm her parents if she confided in them. Leslie Sautter testified that Karen said defendant had threatened to throw the rings he presented to her into the ocean if she would not accept them. Diane Ijames declared that Karen said defendant had told her he had purchased adjoining cemetery plots for her and for him. Professor Resch and Diane Ijames also testified that Karen said defendant had displayed a gun when she, defendant's wife, and defendant met in a parking lot. Dale Moore stated that Karen requested

him to witness two parking lot meetings she had with defendant because she feared him. Professor Resch and Leslie Sautter further testified that Karen told them defendant often went into rages, had a terrible temper, and she feared him.

The foregoing testimony falls into two groups: the first four statements are threats allegedly made by defendant to Karen which she then related to friends, and the last three consist of Karen's remarks to friends which no more than purport to reflect her attitude toward defendant. The testimony was introduced to show Karen's state of mind prior to her death.

We start by analyzing the first group of statements, which constitute hearsay on hearsay: in each instance the prosecution witnesses reiterated what Karen reported defendant had told her. Had any witness himself overheard defendant threaten Karen, that witness could have properly testified to the content and manner of the threat. As long as the alleged threat was not too remote in time, such testimony would have been relevant to defendant's intent, a material issue, and admissible under the admissions exception to the hearsay rule. (See Evid. Code, § 1220.) In the instant case, by contrast, not a single witness produced by the prosecution actually heard defendant threaten Karen. "While threats made by defendant are, of course, material, they must be testified to by the person who heard them, not by someone who was told by someone else that they had been made." (*People* v. *Merkouris* (1959) 52 Cal.2d 672, 696 [344 P.2d 1] (Peters, J., dissenting).) Thus the threats allegedly made by defendant may well be highly relevant in determining his intent at the time of Karen's death (i.e., whether his conduct was intentional or not), but as double hearsay they cannot be admitted under the admissions exception.[1]

The People contend, however, that all the hearsay testimony, including the alleged hearsay threats, was admissible to show Karen's state of mind at the time of her death. In

[1]The People rely on *People* v. *Cooley* (1962) 211 Cal.App.2d 173 [27 Cal.Rptr. 543], for the proposition that hearsay threats reiterated to third persons are admissible. In *Cooley* the erroneous admission of the hearsay threats was not prejudicial since the defendant's threats had been directly overhead by others who testified at trial. This testimony was admissible under the admissions exception and hence the testimony of those who heard the threats from the victim alone could be considered merely cumulative. Nevertheless, the court's rationale in sustaining the admissibility of the double hearsay threats was in conflict with this court's decisions in *People* v. *Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764], and *People* v. *Purvis* (1961) 56 Cal.2d 93, 97-98 [13 Cal.Rptr. 801, 362 P.2d 713], and is disapproved.

*People* v. *Hamilton* (1961) 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473], this court delineated the principal requirements which must be satisfied before the state-of-mind exception to the hearsay rule can be invoked. ██ "Undoubtedly, in a proper case, and in a proper manner, testimony as to the 'state of mind' of the declarant, where there is an issue in the case is admissible, but only when such testimony refers to threats as to future conduct on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused." Defendant insists that the hearsay testimony was not relevant to any issue presented by his defense.

In our cases involving hearsay threats, admissibility has always been approached through a careful examination of the precise issues to which the threats might be relevant. Thus, Karen's state of mind would have been in issue in the absence of direct proof that she had been with defendant at the time of her death, or had defendant claimed self-defense. Had Karen told a friend that she had a date on the night of her death, for example, the friend's testimony would have been admissible to enable the factfinder to infer that she had actually gone out on that night. (*People* v. *Alcalde* (1944) 24 Cal.2d 177, 185 [148 P.2d 627].) Or had defendant claimed self-defense, he would have placed Karen's state of mind at issue: since a claim of self-defense requires the trier of fact to find that the other party was the aggressor, the prosecution, through rebuttal testimony, could have shown that Karen was apprehensive and not likely to be aggressive. Her fear would then have been a factor properly before the factfinder in its deliberations on the defendant's claim of self-defense. (*People* v. *Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764]; see *People* v. *Purvis* (1961) 56 Cal.2d 93, 98 [13 Cal.Rptr. 801, 362 P.2d 713].) Similarly, Karen's state of mind clearly would have been placed in issue had the police investigation produced any evidence of a struggle preceding her death or had the neighbor, who observed the young couple approach defendant's apartment, testified that Karen entered involuntarily.

██ Defendant contends, in addition, that Karen's state of mind is not in issue where the defense is accidental shooting so long as the defense does not argue that the shooting arose accidentally out of a struggle instigated by the victim.

We cannot agree. Even under the circumstances of this case, no indication of a struggle being evident, some probative value attaches to Karen's expressed fear of defendant because it enables the factfinder to infer that Karen might have been reluctant to handle a gun in defendant's presence.[2] We thus conclude that Karen's expressions of fear were relevant to an issue of fact raised by the defense, i.e., whether Karen was willing to handle the gun, as defendant asserted.

■ We are nevertheless persuaded that the statements should have been excluded from evidence. ■ In *People* v. *Hamilton* (1961) *supra*, 55 Cal.2d 881, 893-896, we said that statements indicating a declarant's state of mind cannot be admitted into evidence unless exacting standards are met. An initial requirement is "that such testimony is not admissible if it refers solely to alleged past conduct on the part of the accused. This is so because to try and separate state of mind from the truth of the charges is an almost impossible task." (*Id.* at pp. 893-894.) A second requirement, equally important, is that there must be "at least circumstantial evidence that [the statements] are probably trustworthy and credible." (*Id.* at p. 895.)

■ In this case neither requirement was fulfilled. Most of the statements made by Karen refer to past conduct of defendant: the drawing of the gun in the parking lot, his temper tantrums, the purchase of adjoining cemetery lots, his previous threats to kill her. Karen's credibility was also cast in doubt. One example will suffice: Professor Resch's conversation with Karen after she had missed a midterm examination. She had called at his office to explain why she missed the test. At that time she was dating two men, defendant and Dale Moore; she was intimate with both, and it is not unlikely she claimed a fear of defendant as a pretext for having missed the examination. By contrast, Karen never told her parents, with whom she was close, that she was afraid of defendant or that defendant had threatened to harm them.

■ Our review of other prosecution evidence introduced at trial persuades us that it cannot be seriously contended the error was nonprejudicial. (*People* v. *Watson* (1956) 46 Cal.2d

---

[2]Karen's parents testified that she had a "fear of guns." This evidence, though hearsay, was deemed admissible because it was relevant to the issue of whether Karen would have been likely to handle the gun, as defendant claimed. In this case his defense of accidental shooting made Karen's attitude toward guns a material issue. None of the hearsay statements with which we are concerned bears on Karen's asserted fear of firearms.

818, 836 [299 P.2d 243].) While the trial judge cautioned the jury that the testimony could be used only in evaluating Karen's state of mind and could not be used in determining whether defendant executed his threats, it is apparent that the prosecution used Karen's repeated statements of fear of defendant to convince the jury that defendant murdered Karen.[3] We need not dwell on the damaging impact of such hearsay testimony since in *Hamilton* and elsewhere we have fully explored its inherently inflammatory and prejudicial nature.

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Fourt in the opinion prepared by him for the Court of Appeal in *People* v. *Lew* (Cal.App.) 63 Cal.Rptr. 632.

BURKE, J.—I dissent. In my opinion the majority has applied a self-contradictory and unduly narrow test to determine the admissibility of evidence regarding the state of mind of the victim in a murder trial.

Each of five witnesses testified that at the time of their conversation with her, Karen declared she was afraid that defendant would kill her or harm her parents. Such testimony, although hearsay, was admissible to prove that Karen did in fact fear defendant at the time of the conversations. The majority concede that "Karen's expressions of fear were

---

[3]This case went to trial before the provisions of the new Evidence Code became effective. Section 1250, which sets forth the state-of-mind exception, is in all essential respects a codification of the common law then existing in this jurisdiction. The legislative committee comment demonstrates that the reasoning herein is in complete accord with section 1250: "Statements of a decedent's then existing fear—i.e., his state of mind—may be offered under Section 1250, as under existing law, either to prove that fear when it is itself in issue or to prove or explain the decedent's subsequent conduct. Statements of a decedent narrating threats or brutal conduct by some other person may also be used as circumstantial evidence of the decedent's fear—his state of mind—when that fear is itself in issue or when it is relevant to prove or explain the decedent's subsequent conduct; and, for that purpose, the evidence is not subject to a hearsay objection because it is not offered to prove the truth of the matter stated. . . . *But when such evidence is used as a basis for inferring that the alleged threatener must have made threats, the evidence falls within the language of Section 1250(b) and is inadmissible hearsay evidence.*" (Italics added.)

relevant to an issue of fact raised by the defense, i.e., whether Karen was willing to handle the gun, as defendant asserted." Indeed, Karen's declarations of fear go directly to factual matters at the heart of the defense presented to the jury. There were only two witnesses to the discharge of the gun; one is dead, the other is charged with her murder. The defendant maintains that the victim asked to see the weapon and that it accidentally fired. Under the circumstances, admission of testimony by five witnesses indicating that Karen would have been too frightened to accompany defendant alone to a rendezvous to examine and later test fire a loaded automatic weapon was vital to an accurate assessment by the jury of the events which transpired in defendant's apartment. This court has recognized that "under certain circumstances declarations are admissible to prove a state of mind at a particular time although uttered before or after that time, apparently on the theory that under these particular circumstances '[t]he stream of consciousness has enough continuity so that we may expect to find the same characteristics for some distance up or down the current.' [Citing authorities.]" (*People* v. *One 1948 Chevrolet Conv. Coupe*, 45 Cal.2d 612, 621 [290 P.2d 538, 55 A.L.R.2d 1272]; cf. Evid. Code, § 1250.)

Although "declarations directly asserting the existence of a mental condition on the part of the decedent-declarant, and not including a description of the past conduct of a third person that may have caused that mental condition, are and should be admissible, they should be admitted only where there is at least circumstantial evidence that they are probably trustworthy and credible. As was said by this court in *People* v. *Brust*, 47 Cal.2d 776, 785 [306 P.2d 480], in quoting from *People* v. *Weatherford*, 27 Cal.2d 401, 421 [164 P.2d 753], such declarations are 'admissible only if there appears to be a necessity for that type of evidence and a circumstantial probability of its trustworthiness (V Wigmore, p. 202, § 1420). . . . The death of the declarant creates the necessity for resort to hearsay and the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of truthworthiness [*sic*]. (VI Wigmore, § 1725, p. 80.)' (See also McCormick, Evidence (1954), § 268, p. 568.) Wigmore also has stated that such declarations are admissible only when they are 'made at a time when there was no motive to deceive.' (6 Wigmore, Evidence, (3d ed. 1940), § 1730, p. 94.)" (*People* v. *Hamilton*, 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473]; cf. Evid. Code, § 1252.)

The record indicates sufficiently the probable credibility of Karen's declarations of mental state, and discloses no convincing reasons for deceiving the witnesses. Dale Moore learned of Karen's fears when she asked him to observe two meetings with defendant in order to protect her. Moore, a boyfriend with whom she was intimate, had threatened to break off their relationship if she did not stop seeing defendant. He observed both meetings, one of which was an emotionally charged confrontation between Karen, defendant, and defendant's wife in a parking lot. Professor Resch learned of Karen's fears when she missed a quiz in her psychology class and came to his office to explain that she had been upset and to arrange for a makeup examination. He noticed that she was "less well kempt" than usual, her face was flushed, and she was fidgety. Although the makeup examination was presumably scheduled at that time, Karen returned to discuss her fears with Professor Resch at a second meeting held several days later, and possibly at a third meeting as well. Leslie Sautter, a girl friend of Karen since childhood, learned of her fears during a conversation at the former's home; nothing in the record indicates that the conversation was anything other than a discussion of personal problems between old friends. Patricia Mullen and Diane Ijames, both friends of Karen for over a year, learned of her fears in separate and similarly innocuous conversations during working hours at the Broadway Department Store.

Each witness also testified that Karen explained the reasons for her state of mind in terms of alleged past conduct by the defendant. Such testimony was not introduced to prove the truth of the threats or of the other matters asserted as explanations for her state of mind, but merely as circumstantial evidence of her state of mind. Such evidence must be received with great caution, lest the jury be misled into considering it as proof of the past conduct alleged rather than as proof of the declarant's state of mind. However, the trial judge carefully reiterated his precautionary instruction admonishing the jury that the testimony of the witnesses concerning those conversations with Karen was received for the limited purpose of determining Karen's state of mind. In such a situation the jury's task may be difficult, but it is not impossible, and in the appropriate case it becomes the jury's responsibility to render such determinations. The issue of whether the probative value of the statements extracted from the conversations outweighed any potentially prejudicial

effect that the testimony might have had, was a matter primarily for the sound discretion of the trial court. (*Estate of Anderson,* 185 Cal. 700, 719 [198 P. 407]; *Adkins* v. *Brett,* 184 Cal. 252, 258 [193 P. 251]; former § 1868, Code Civ. Proc., repealed by Stats. 1965, ch. 299, § 56, operative January 1, 1967; cf. Evid. Code, § 352.)

A review of the record indicates that the evidence was correctly admitted. Defendant was in an emotional dilemma. He was infatuated with Karen, his wife had discovered his infatuation, and Karen was undecided whether to reject him. On the way to his apartment on the day of Karen's death, defendant drove to his bank and cashed a $65 check, leaving a balance of slightly more than $2 in his checking account. He visited his safety deposit box and removed his wife's jewelry and ownership documents pertaining to the car, boat, and trailer which he and his wife owned, ostensibly because his wife wanted the items in her possession pending their divorce. He executed the ownership documents and placed them together with an executed savings account withdrawal slip on the living room table in an envelope addressed to his wife. Defendant was alone with Karen when his gun discharged, fatally injuring her. The weapon had a safety device plainly marked ''safe'' and ''fire'' and could not be fired in the former position. Expert testimony indicated that 9 pounds of pressure was required to fire the automatic pistol; in contrast, smaller weapons with a ''hair trigger'' require only from 3 or 4 ounces to 1½ pounds of pressure. Expert testimony further indicated that the weapon was within 10 inches of Karen's head when the shot was fired, and that the bullet entered her left temple just above the eye. As a student of police science, defendant was presumably familiar with criminal evidence. When he was asked to submit to paraffin tests of his hands, he refused to take them; when advised that he was required to comply, he again attempted to avoid the test, but finally submitted voluntarily. Nitrate deposits were found on his left hand; no such deposits were found on Karen's hands. All this competent evidence strongly supported the inference that the injury resulting in Karen's death was deliberately inflicted by the defendant. Under the circumstances, the jury was entitled to receive the benefit of any additional evidence which might tend to aid their deliberations by disclosing Karen's state of mind on the date of her death.

The majority follow the rule set forth in *People* v. *Hamilton, supra,* 55 Cal.2d 881, 895, allowing evidence of threats to

do future violence only so long as the testimony with regard to such threats does not refer to past acts of the defendant: "In such cases [where the declarations of state of mind refer also to past acts of the defendant] the authorities are agreed that it is impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations, and that for such reasons such declarations are inadmissible."

That rule of automatic exclusion has been criticized as unduly narrow and self-contradictory. Justice White, dissenting in *Hamilton,* aptly observed that "To me it seems a sad commentary upon the intelligence of jurors, in the light of the court's constant, painstaking and specific admonitions, to say that they were unable to follow them or that in violation of their sworn obligations as jurors they cast aside such admonitions. I cannot indulge in either of those assumptions, . . ." (55 Cal.2d at p. 904.) The Evidence Code, which was adopted before the trial but became effective after the trial, omits any such automatic rule. The comments to section 1252 of the code label the above-mentioned *Hamilton* tests as confusing and contradictory: "The declarations are inadmissible if they refer to past conduct of the accused; nevertheless, they are admissible 'only' when they refer to his past conduct, *i.e.,* his threats. The declarations, to be admissible, must show primarily the state of mind of the declarant and not the state of mind of the accused; nevertheless, such declarations are admissible 'only' if they refer to the accused's statements of his state of mind, *i.e.,* his intent to do future harm to the victim. . . . The Evidence Code does not freeze the courts to the arbitrary and contradictory standards mentioned in the *Hamilton* case for determining when prejudicial effect outweighs probative value."[1]

---

[1]These comments reflect those of Justice White in his dissent: "If the purpose of admitting such evidence is to show the 'state of mind' of the declarant where, as in the instant case, it was concededly an issue in the case, then I am at a loss to understand why declarations of threats to do future violence should be regarded as less prejudicial than the narration of alleged past conduct. And surely if the purpose of admitting 'state of mind' testimony is to be achieved, then as in the instant case, such a state of mind as fear of the defendant could be engendered by past actions of brutality, probably more so than by unexecuted threats of promised future harm to the declarant. Complaint is made in the majority opinion that testimony of past conduct tends more to establish the state of mind of the accused rather than of the declarant. Would not such a conclusion be as applicable to threats of future violence as to prior executed acts of violence? This would appear to be a distinction without a difference." (55 Cal.2d at pp. 902-903.)

Justice White carefully set forth the effects of the automatic rule of exclusion propounded in *Hamilton*: "I agree that evidence of this character may be excluded as legally irrelevant if the court determines that its value is outweighed by policy considerations of undue prejudice, lapse of time or surprise. The majority opinion seems to hold that the evidence here was so highly prejudicial that it outweighed any probative value and should have been excluded. I feel that these are matters primarily addressed to the sound discretion of the trial court. The majority would completely emasculate the rule providing for 'state of mind' testimony unless it refers to threats as to future conduct on the part of the accused, thereby withholding from the trier of facts evidence of past conduct which would materially aid the arbiter of facts in determining whether the declarant was actually in fear of the accused. I am apprehensive lest such a rule would militate against convictions of murder in proper cases." (55 Cal.2d at p. 903.) The drafters of the Evidence Code shared his apprehensions, and the results in this case demonstrate the correctness of their views.

I would affirm the conviction.