206 N.J. Super. 382 (1986)
502 A.2d 1171
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DIANE DOWNEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 1985.
Decided January 9, 1986.
*383 Before Judges FRITZ, GAYNOR and BAIME.
Dierdre M. Barz argued the cause for appellant (Thomas S. Smith, Acting Public Defender, attorney; Dierdre M. Barz, designated counsel and on the brief).
Gerard Boruch argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Ann *384 M. McKeon, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted jury trial, defendant was convicted of murder and was sentenced to life imprisonment (N.J.S.A. 2C:11-3). Although she advances numerous arguments on appeal, her principal contention is that the trial judge erred by admitting into evidence a letter written by the victim prior to his death in which he recounted his concern that defendant would attempt to harm him. Defendant argues that the letter constituted hearsay evidence and that its admission deprived her of a fair trial. We agree and are constrained to reverse.
The voluminous trial record discloses the following salient facts. On the morning of December 23, 1981 defendant informed a neighbor that she had just discovered the body of her husband in the kitchen of their home. The police were immediately notified and arrived at the scene shortly after 11:30 a.m. Upon arriving at the Downey home, Patrolman Jack McDonald observed two vehicles parked in the driveway, one of which was a station wagon occupied by two women. The officer approached the automobile and asked the women, who were conversing in a calm manner, whether they reported a murder. At that point, defendant confirmed that she had discovered the body of her husband. When Patrolman McDonald asked what had occurred, defendant turned to the driver, who was later identified as Linda Prudden, and exclaimed "[g]o in the house and find out if you want to know."
After a back-up police unit arrived, the officer, accompanied by Patrolman Dennis Duvall, entered the house. Upon opening the front door, the officers observed blood "splattered" on the walls and floor of the hallway leading to the kitchen. The body of the victim was found in an upright sitting position beneath the kitchen table near the entranceway to the dining room clad *385 only in an open pajama top. The victim's intestines were protruding from his body. The officers observed that the kitchen furniture was in a state of disarray and that the floor was completely covered with blood.
The officers then surveyed the remainder of the house. They followed a trail of blood which led from the kitchen through a hallway into the bathroom. The bathroom hamper was upended and the floor was covered with coagulated blood. The officers entered the bedroom where they observed blood on the walls and the bed. Although all of the dresser drawers were open, their contents had apparently not been disturbed.
After making these observations, Patrolman Duvall entered the bottom level of the residence where he found traces of mud near the rear door which was ajar. The officer also noticed a "chip of wood" from the door frame and a "striker plate" lying on the ground. Although these observations initially supported the theory that someone had forcibly entered the premises, it subsequently developed that the plate could have been pried off the door only from the inside of the house.
After exiting the house, the officers briefly questioned defendant in the driveway. In response to Patrolman McDonald's questions, defendant stated that she last saw her husband alive on the night before and that she discovered his body at approximately 11:15 a.m. As the two were conversing, the officer noticed dried blood and a bandaid on defendant's right hand. Defendant said that she had cut her hand on a piece of glass beside her husband's body. She failed to explain the presence of a dark stain on the top of one of her shoes.
At approximately 11:30 a.m., Sergeant Joseph Triano and Detective Ernest Walton arrived. After making preliminary observations of the house, Detective Walton asked defendant and Prudden to accompany him to police headquarters. Pursuant to this request, both women followed Detective Walton's automobile in Prudden's white station wagon.
*386 Upon arriving at the police station, the women were escorted to the ladies room because they complained of nausea. Detective Walton then interviewed both women jointly for approximately one and one-half hours. Defendant stated that on the preceding night she and Prudden were Christmas shopping when the latter's automobile abruptly broke down near the victim's place of employment. The decedent was able to start the automobile, however, and defendant and Prudden returned to the latter's home. Defendant explained that she was living at Prudden's residence during her convalescence from an automobile accident which had occurred in March 1980. According to defendant, she had conversed with her husband on the telephone from midnight until approximately 1:00 a.m.
Defendant recounted the following facts concerning her discovery of her husband's body. On the morning of December 23, 1981, she, her daughter and Prudden drove to the victim's residence in order to deliver several packages. Upon entering the house, she found her husband's body in the kitchen. She stated that she cut her hand on a jagged piece of glass near the victim's body. She then notified a neighbor of her discovery and directed him to contact the police. According to defendant, she drove to her brother's house, which was nearby, where she left her daughter. She then returned to the Downey house to await the arrival of the police.
After relating this information to Detective Walton, defendant and Prudden were permitted to leave. The two proceeded to defendant's brother's house where her family had gathered. In the meantime, Sergeant Triano decided to question defendant further. Upon his request, defendant and Prudden, accompanied by the former's brother, returned to police headquarters.
Upon arriving at the police station, defendant and Prudden were interviewed separately. Defendant's brother was permitted to be present during most of her interrogation. However, shortly after 4:00 p.m., he was asked to leave. At approximately 5:00 p.m., defendant gave a formal written statement to the *387 police essentially repeating her prior account. Detective Thomas Rizzo, who took the statement, testified that defendant was not apprised of her constitutional rights at this time because she was not in custody. According to Detective Rizzo, defendant was free to leave the police station until approximately 7:35 p.m. when the information derived from the officers' investigation was reviewed. At that point, defendant was advised of her rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
After signing a "preamble waiver" document, defendant was questioned further. Defendant denied that she had been in the area of the victim's home on the evening of December 22, 1981. She also denied walking near the rear door of the residence after discovering her husband's body. Defendant was then confronted with a statement of a neighbor who observed Prudden driving her station wagon in the vicinity of the Downey home at approximately 11:00 p.m. However, defendant repeated her denial. After additional questioning, she finally admitted that she had been in the area but had not stopped. Defendant was then advised that the police had discovered her fingerprint on traces of blood found on the rear door. She again denied being in that area of the house. Defendant subsequently remembered, however, that she had walked to the rear of the house and had "handled" the door knob.
The State presented substantial evidence placing defendant and Prudden at the victim's home. As noted previously, a resident of the neighborhood observed Prudden in her automobile in the area of the Downey residence at approximately 11:00 p.m. Although this neighbor did not see defendant in the vehicle, the latter admitted being with Prudden throughout the evening and night-time hours of December 22. Another neighbor observed Prudden's automobile parked in the victim's driveway sometime after 11:00 p.m. The police discovered a "cigarette butt" of the brand defendant generally smoked in the decedent's home. A robe removed from Prudden's residence contained traces of blood with characteristics similar to those of *388 defendant. The victim's wallet, broken glass and numerous items of clothing, sheets and towels stained with human blood were found below the cargo area of Prudden's station wagon. Footprints corresponding to those of Prudden were found implanted in blood on the floor of the victim's house. A knife with configurations matching the dimensions of the decedent's wounds was discovered concealed behind several ceiling tiles in the laundry area of Prudden's house. A friend of the victim spoke to him on the telephone between 12:35 a.m. and 1:35 a.m. on December 23, 1981. When he called later in the morning, a woman answered the telephone and immediately hung up.
Much of the State's evidence concerned defendant's relationship with Prudden and their possible motive in killing the victim. Pauline Downey, the victim's mother, testified that Prudden's friendship with defendant created a great deal of marital discord. The victim suspected the defendant of engaging in a lesbian relationship with Prudden. As noted previously, defendant moved into Prudden's residence and the two shared the same bedroom. Prudden's husband apparently occupied a separate bedroom. The State introduced into evidence a note written by defendant professing her love for Prudden. In contrast, the police found an unmailed Christmas card in Prudden's automobile in which defendant, in obscene terms, noted her contempt for the decedent.
The State presented additional evidence disclosing the victim's fear of defendant and the Pruddens. Specifically, the decedent apparently suspected that the three were plotting against him. Over defense counsel's objection, the trial judge admitted into evidence an undated handwritten letter signed by the victim. Because of the importance of the letter we quote it verbatim:
To Anyone, If anything happens to me or my kids, you can go get, number one, Diane Downey, number two, Linda Prudden, number three, Ray Prudden [Linda Prudden's husband]. They are at 218 Hardy Avenue, Bound Brook, New Jersey, 356-8574. They would be the cause of it. [Signed Robert R. Downey] P.S. In the event of this letter opened, I want my kids to have everything I have.
*389 Although the record is far from clear, it would appear that Prudden ultimately received the letter and turned it over to the police after the victim's death. While the decedent never fully disclosed the contents of the letter to his mother, he vaguely referred to it in their conversations.
We need not recount at length the defense presented at trial. Defendant elected not to testify and no attempt was made to rebut the factual circumstances surrounding the death of the decedent. Most of the evidence related to defendant's marriage and her relationship to the victim. Friends and family members testified that defendant and the decedent had a good relationship and, therefore, there was no apparent motive for the murder.

I
We first address defendant's argument that the victim's letter constituted inadmissible hearsay. Initially, we note that the letter was offered "to prove the truth of the matter stated" and, thus, clearly fell within the purview of the definition of hearsay set forth in Evid.R. 63. Stated somewhat differently, we are not concerned here with a verbal act having independent probative value. See Ringwood Assoc's Ltd. v. Jack's of Route 23, 166 N.J. Super. 36, 42-43 (App.Div. 1979). Although the letter unquestionably constituted strong evidence of the disintegration of the marriage between the defendant and the victim, no limiting instructions so confining the jury's consideration of it were requested by the prosecutor and none were given by the trial judge. Instead, the prosecutor in his summation luridly referred to the letter as a voice from the grave identifying defendant and Prudden as the perpetrators of the crime.
The State does not contend that the letter constituted a verbal act. Rather, the evidence was admitted under the traditional state of mind exception to the hearsay rule. That principle allows admission of extrajudicial statements to show the state of mind of the declarant when it is in issue in the case. It *390 also permits admission of such statements to disclose an intent on the part of the declarant to perform some future act if the occurrence of such conduct is a material issue in dispute.
The state of mind exception to the hearsay rule has long been recognized and approved notwithstanding the fact that the right to cross-examination is denied. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); State v. Baldwin, 47 N.J. 379 (1966); State v. Thornton, 38 N.J. 380 (1962) aff'd 45 N.J. 529 (1965), cert. den. 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963); Robertson v. Hackensack Trust Co., 1 N.J. 304 (1949); State v. Lang, 108 N.J.L. 98 (E. & A. 1931); State v. Ready, 78 N.J.L. 599 (E. & A. 1909); Hunter v. State, 40 N.J.L. 495 (E. & A. 1878); State v. Sejuelas, 94 N.J. Super. 576 (App.Div. 1967); In re Spiegelglass, 48 N.J. Super. 265 (App.Div. 1958). Particularly where the declarant is deceased, the rule is rooted in necessity and justified upon the basis that the circumstances provide a rational substitute for the benefit of cross-examination. It is said that the purpose and object underlying the confrontation requirement are satisfied because the circumstances afford a sufficient guarantee of testimonial trustworthiness to justify admission. See McCormick, Evidence, § 294 (3 ed. 1984); 6 Wigmore, Evidence, § 1725 (Chadbourn rev. 1976). The principle allowing admission of such statements is presently codified in Evid.R. 63 (12) which provides in pertinent part as follows:
A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief, to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant * * * *
The necessary predicate to admission of such evidence is that: a) the statement reflects a mental or physical condition of the declarant which constitutes a genuine issue in the case or b) the statement is otherwise relevant to prove or explain the declarant's conduct. Here, the decedent's expression of fear or *391 concern that defendant and Prudden were plotting against him satisfied neither of these evidentiary requisites. Clearly, the victim's state of mind was not a relevant issue to be decided by the jury. We are not dealing with, for example, a question concerning the testamentary intent of a decedent, In re Spiegelglass, supra at 272, or an issue as to whether a deceased might have harbored a suicidal design, Shepard v. United States, 290 U.S. 96, 102, 54 S.Ct. 22, 25, 78 L.Ed. 196, 200-201 (1933), or was accidentally killed, People v. Lew, 68 Cal.2d 774, 779, 69 Cal. Rptr. 102, 105, 441 P.2d 942, 945 (Sup.Ct. 1968) or so feared the accused that he was an unlikely aggressor where the justification of self-defense is raised, People v. Spencer, 71 Cal.2d 933, 945, 80 Cal. Rptr. 99, 108, 458 P.2d 43, 52 (Sup.Ct. 1969). In this case, no relevant issue was presented as to the victim's state of mind prior to or at the time of the murder. The important fact here was the state of mind of the defendant, not that of the deceased.
Nor was the letter relevant to prove or explain the victim's conduct. Evid.R. 63 (12) permits admission of a declarant's statement concerning his intent to engage in some future course of conduct to prove that he subsequently performed the intended act. To that extent, the evidentiary principle embraces the common notion that people often do that which they say they intend to do. By its very terms, however, the rule is limited to statements offered to prove the declarant's conduct, not that of another person.[1] We do not doubt that a declarant's prognostication of someone else's future conduct might ultimately prove well founded. We merely note, however, that *392 such evidence may be as valuable for concealing as for disclosing the true facts.
Counsel have not furnished us with any published New Jersey decision directly bearing upon the issue presented. Nor has our independent research been availing. There is no dearth of decision in other jurisdictions, however. While the issue has received somewhat uneven treatment, the great weight of authority clearly precludes admission of a victim's expression of concern that another might have reason to harm him. See, e.g., United States v. Day, 591 F.2d 861, 882-883 (D.C. Cir.1978); United States v. Brown, 490 F.2d 758, 762-774 (D.C. Cir.1973); Giles v. United States, 432 A.2d 739, 745 (D.C.App.Ct. 1981); Clark v. United States, 412 A.2d 21, 25-30 (D.C.App.Ct. 1980); State v. Christensen, 129 Ariz. 32, 36, 628 P.2d 580, 584 (Sup.Ct. 1981); State v. Ulvinen, 313 N.W.2d 425, 428 (Minn. Sup.Ct. 1981); People v. Coleman, 116 Ill. App.3d 28, 34, 71 Ill.Dec. 819, 822, 451 N.E.2d 973, 976 (Ill. App.Ct. 1983). Contra State v. O'Daniel, 62 Haw. 518, 525, 616 P.2d 1383, 1389 (Sup.Ct. 1980); State v. Parr, 93 Wash.2d 95, 98, 606 P.2d 263, 265 (Sup.Ct. 1980); Sallee v. State, 544 P.2d 902, 907 (Okla. Ct. App. 1976). The courts have developed three well-defined exceptions in which such statements have been admitted. The most common of these relates to a defendant's claim of self-defense as justification for the killing. When such a defense is asserted, it has been held to be proper to permit rebuttal by admission of the victim's extrajudicial statements concerning his fear of the defendant, thus, rendering it unlikely that the deceased was the aggressor in the first instance. See, e.g., People v. Atchley, 53 Cal.2d 160, 171-172, 346 P.2d 764, 770 (Sup.Ct. 1959), cert. dism. 366 U.S. 207, 81 S.Ct. 1051, 6 L.Ed.2d 233 (1961); State v. Singh, 586 S.W.2d 410, 418 (Mo. App.Ct. 1979). Second, where a defendant seeks to defend on the basis that the deceased committed suicide, "evidence that the victim ... made statements inconsistent with a suicidal bent" have generally been admitted. United States v. Brown, supra at 767. See also Shepard v. United States, supra, 290 U.S. at 102-104, 54 S.Ct. *393 at 25, 78 L.Ed. at 201; Commonwealth v. Del Valle, 351 Mass. 489, 221 N.E.2d 922, 924 (Sup.Jud.Ct. 1966). A third situation relates to the claim of accidental death. Jones v. United States, 398 A.2d 11, 13 (D.C.App.Ct. 1979); Campbell v. United States, 391 A.2d 283, 287 (D.C.App.Ct. 1978). Even in cases that fall within these categories, the courts have recognized that such statements are fraught with inherent dangers and require rigid limitations including clear limiting instructions. United States v. Brown, supra at 766.
We conclude that the decedent's letter was not admissible under Evid.R. 63 (12) and did not fall within any of the exceptions to the general principle precluding admission of such statements recognized in other jurisdictions. Of course, we are fully aware that adoption of our evidentiary rules was not designed to bar the growth and development of the law of evidence "in accordance with fundamental principles to the end that the truth may be fairly ascertained." Evid.R. 5. See also Eden v. Conrail, 175 N.J. Super. 263, 282 (App.Div. 1980), mod. on other grounds 87 N.J. 467 (1981). We would be short on realism were we to fail to acknowledge that the events surrounding the decedent's preparation of the letter provided some circumstantial indicia of the reliability of its contents. We note that avoidance of some of the archaic niceties of the hearsay preclusion in favor of a rule dependent only on the presence of special guarantees of reliability has much to commend it particularly where, as here, the declarant is not available.
Nevertheless, we perceive certain institutional constraints which preclude us from taking such a course. We observe that our evidentiary rules thoroughly treat questions concerning the admissibility of hearsay statements made by a declarant unavailable because of his death. Evid.R. 63 (5) permits admission of dying declarations where the declarant "was conscious of his impending death." Evid.R. 63 (32) is far broader in scope. That rule allows admission of statements made in good faith by a declarant upon his personal knowledge where "there is a probability from the circumstances that the [declaration] is *394 trustworthy." However, this rule is applicable only in civil proceedings. Unlike the Federal Rules in which Fed.R.Evid. 804 (b)(5) provides a "residuary hearsay exception" for unavailable declarants, United States v. Van Lufkins, 676 F.2d 1189, 1191-1192 (3 Cir.1982) and Robinson v. Shapiro, 646 F.2d 734, 741-742 (2 Cir.1981) our rules contain no similar counterpart. Under these circumstances, we are extremely reluctant to embark upon an uncharted course, the ramifications of which undoubtedly would extend far beyond the boundaries of this case.
We, thus, hold that the trial judge erred when he admitted the letter and the corresponding testimony of the decedent's mother concerning its existence.

II
We next consider whether admission of this evidence constituted harmless error, as the State contends. We start with the premise that not every judicial error will have the effect of vitiating an otherwise valid conviction. If an error is not of constitutional dimensions, it is to be disregarded by an appellate court "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. See also State v. LaPorte, 62 N.J. 312, 318 (1973). However phrased, "the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict." State v. Macon, 57 N.J. 325, 335 (1971). The possibility must be real, "one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Id. at 336.
Applying that standard, we are convinced that admission of the letter requires a reversal of defendant's conviction. While it is true that the evidence against defendant was substantial, the compelling nature of the decedent's letter coupled with the prosecutor's repeated and graphic references to it in his summation *395 clearly mandate that result.[2] The trial judge characterized the letter as "damaging" evidence and we fully agree with this assessment. This evidence not only identified defendant as one of the perpetrators of the crime, it also tended to establish her illicit relationship with Prudden and their conspiracy to kill the decedent. We note that most of the physical evidence presented by the State pointed to Prudden's guilt.[3] Against this backdrop, admission of the letter served to support the State's theory that she and defendant were in league with each other.
We recognize the perils of reviewing a dry record from the vantage point of twenty-twenty hindsight. Nevertheless, we are equally cognizant of the limited parameters within which we are obliged to act. We cannot say, with fair assurance, that the jury was not substantially swayed by this evidence.[4] Hence, we are constrained to reverse.

*396 III
Since the case must be retried, we will review the remainder of defendant's arguments. Initially, we are entirely satisfied that defendant's oral and written statements were voluntarily given and that she knowingly and intelligently waived her constitutional rights. In determining that defendant's statements were voluntary, the trial judge properly examined the "totality of the circumstances," State v. Hampton, 61 N.J. 250, 272 (1972), and concluded that the State had sustained its burden of proof beyond a reasonable doubt. State v. Miller, 76 N.J. 392, 404-405 (1978). See also State v. Kelly, 61 N.J. 283, 294 (1972); State v. Yough, 49 N.J. 587, 600-601 (1967). We are thoroughly convinced from our careful review of the record that the judge's findings and conclusions are supported by substantial credible evidence. State v. Johnson, 42 N.J. 146, 162 (1964).
The judge also determined that defendant was not in custody when initially questioned by the police and, therefore, it was not incumbent upon them to apprise her of the Miranda warnings. We agree. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. The police are not required to administer Miranda warnings to everyone they question. "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977). See also California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 *397 (1983). Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody". Oregon v. Mathiason, supra, 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719.
Measured against that standard, we are in complete accord with the trial judge's finding that defendant was not in custody or otherwise deprived of her freedom of action until approximately 7:35 p.m. At that time, the initial phase of the police investigation concluded. The information so obtained pointed to defendant's guilt. Defendant was no longer free to leave the police station, as she had done previously, and she was accordingly apprised of her constitutional rights. State v. Cunningham, 153 N.J. Super. 350, 352-354 (App.Div. 1977); State v. Godfrey, 131 N.J. Super. 168, 176-177 n. 1 (App.Div. 1974) aff'd o.b. 67 N.J. 267 (1975). We conclude that her statements were properly admitted.

IV
Finally, we reject defendant's argument that the trial judge erred in admitting the knife found in Prudden's house. We conclude that there was sufficient evidence to "connect" defendant with the knife. State v. Holland, 59 N.J. 451, 457 (1971); State v. Wade, 89 N.J. Super. 139, 145 (App.Div. 1965), rev'd on other grounds 99 N.J. Super. 550 (App.Div. 1968). As we noted previously, the police discovered the knife concealed behind several unfinished ceiling tiles in the laundry room of the Prudden household. It was undisputed that defendant had been living at that residence since 1980. Under these circumstances, the evidence was sufficient to support the inference that she had complete access to the house, and the items therein were subject to her control. State v. Martinek, 12 N.J. Super. 320, 323 (App.Div. 1951).
So too, there was sufficient circumstantial evidence to support an inference that the knife was used in the commission of the murder. State v. Sinnott, 24 N.J. 408, 415 (1957); State v. *398 Pisano, 33 N.J. Super. 559, 562 (App.Div. 1955), certif. den. 19 N.J. 385 (1955). We discern no sound basis to disturb the trial judge's decision admitting the knife into evidence.

V
The judgment of conviction is reversed and the matter is remanded for a new trial.
NOTES
[1] A limited exception has been created where the statement of intent by a declarant relates to cooperative action involving another person. Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); State v. Thornton, 38 N.J. 380 (1962), aff'd 45 N.J. 529 (1965), cert. den. 374 U.S. 816, 83 S.Ct. 1710, 10 L.Ed.2d 1039 (1963). This exception has been the subject of some criticism, House Comm. on Judiciary, Fed. Rules of Evidence, H.R.Rep. No. 650, 93d Cong., 1st Sess. at 13 (1973), and we merely note that it has no application to the facts of this case.
[2] In his summation, the prosecutor stated:

In a very real sense, that letter was to you, ladies and gentlemen. It could have very well started "Dear Juror, if anything happens to me, Diane Downey and her friends would be the cause of it." Powerful evidence. Read that letter very carefully. He knew what hostility his wife felt for him. He knew that his life was in danger. * * * * We don't know what brought him to that point, but he predicted what happened to him, and he predicted who the people would be who would do it to him, and he tells you in words directly from the grave to go get Diane Downey and her friends, and if you had any questions in your minds, if there was any doubt without that letter, I just don't see how you could reach any other conclusion having that letter, than the conclusion that Robert Downey, on December 23, 1981, was brutally and savagely murdered by his wife and her lesbian girlfriend because he threatened their relationship, because they hated him for it, because it would give them an opportunity to get a hundred and fifteen thousand dollars [from an insurance policy].
[3] Prudden was tried separately and was also convicted.
[4] We note that courts of other jurisdictions have generally rejected the claim that such error is harmless. Clark v. United States, 412 A.2d 21 (D.C.App.Ct. 1980); State v. Ulvinen, 313 N.W.2d 425 (Minn.Sup.Ct. 1981); People v. Lew, 68 Cal.2d 774, 69 Cal. Rptr. 102, 441 P.2d 942 (Sup.Ct. 1968); People v. Hamilton, 55 Cal.2d 881, 13 Cal. Rptr. 649, 362 P.2d 473 (Sup.Ct. 1961) overruled on other grounds in People v. Wilson, 1 Cal.3d 431, 82 Cal. Rptr. 494, 462 P.2d 22, 29 (Sup.Ct. 1969); People v. Coleman, 116 Ill. App.3d 28, 71 Ill.Dec. 819, 451 N.E.2d 973 (Ill. App.Ct. 1983).