785 A.2d 1

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER M. CHAVIES, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 15, 2001—Decided November 9, 2001.

Before Judges HAVEY, BRAITHWAITE and WEISSBARD.

*Peter A. Garcia*, Acting Public Defender, for appellant, (*Donald T. Thelander*, Assistant Deputy Public Defender, of counsel and on the brief).

*John J. Farmer, Jr.*, Attorney General, for respondent, (*Michael J. Williams*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

BRAITHWAITE, J.A.D.

The central issue in this appeal is whether defendant's murder conviction should be reversed because of the judge's charge to the jury that the act of homicide permits the jury to draw an inference that defendant's "purpose was to take life or cause serious bodily injury resulting in death." We conclude that the instruction was erroneous and had the clear capacity to produce an unjust result. *See R.* 2:10–2. We therefore reverse defendant's murder conviction and remand for a new trial on that offense. Because defendant will have to be retried on the murder charge, we address the admissibility of certain portions of decedent's diary and a certain letter written by decedent, that were admitted into evidence by the State. We also address certain sentencing issues that the State concedes are errors and the applicability of the No Early Release Act ("NERA"), *N.J.S.A.* 2C:43–7.2, to a murder conviction in the event defendant is convicted of that offense following a retrial.

I

Following a jury trial, defendant was convicted of murder, *N.J.S.A.* 2C:11–3a(1) and (2); hindering apprehension, *N.J.S.A.* 2C:29–3; fourth degree theft of a credit card, *N.J.S.A.* 2C:21–6c; and four counts of third degree unlawful use of a credit card, *N.J.S.A.* 2C:21–6d. The victim of the murder and the credit card offenses was defendant's girlfriend, Lora M. Freyer. At sentencing, the judge determined that NERA applied to defendant's murder conviction and imposed a life term with a sixty-three and three-quarter year period of parole ineligibility. A consecutive five-year term with a two-year parole bar was imposed on the hindering apprehension conviction. A consecutive eighteen-month

term with a nine-month period of parole ineligibility was imposed on the theft of the credit card conviction. Fifteen-month terms with six months of parole ineligibility were imposed on each of the unlawful use of a credit card convictions, to be served concurrently with each other but consecutively to the other sentence. Defendant's aggregate sentence was life imprisonment plus seven years and nine months, with a sixty-seven-year parole bar.

## II

On appeal defendant raises the following contentions:

*POINT I*

THE JUDGE'S CHARGE IMPROPERLY REDUCED THE STATE'S BURDEN OF PROOF TO A STANDARD LOWER THAN BEYOND A REASONABLE DOUBT AND THEREBY VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. (*U.S. CONST.* AMENDS. V, VI AND XIV; *N.J. CONST.* (1947), ART. I, PARS. 1, 9 AND 10). (Not Raised Below)

*POINT II*

THE ADMISSION OF HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE OF OTHER BAD ACTS, ALLEGEDLY COMMITTED BY DEFENDANT, DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. (*U.S. CONST.*AMENDS. V, VI AND XIV; *N.J. CONST.* (1947), ART. I, PARS. 1, 9 AND 10).

 A. The Other Bad-acts Evidence.

 B. The Court's Limiting Instruction.

*POINT III*

THE FAILURE TO REQUIRE THAT THE JURY MAKE A SPECIFIC FINDING ON COUNT TWO, HINDERING APPREHENSION, AS TO DEFENDANT'S CONDUCT CAUSED THE POTENTIAL OF A NON–UNANIMOUS PATCHWORK VERDICT IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS. (*U.S. CONST.*AMENDS. VI AND XIV; *N.J. CONST.* (1947), ART. I, PARS. 1). (Not Raised Below)

*POINT IV*

THAT PORTION OF DEFENDANT'S SENTENCE UNDER NERA WHICH REQUIRES HIM TO SERVE A [SIXTY–THREE AND THREE–QUARTER–]YEAR PERIOD OF PAROLE INELIGIBILITY AND AN ADDITIONAL [FIVE] YEARS OF PAROLE, MUST BE VACATED AS IT IS ILLEGAL.

*POINT V*

DEFENDANT'S AGGREGATE CONSECUTIVE SENTENCE OF LIFE IMPRISONMENT PLUS SEVEN YEARS, NINE MONTHS WITH AN AGGRE-

GATE [SIXTY–SEVEN–] YEAR PERIOD OF PAROLE INELIGIBILITY IS MANIFESTLY EXCESSIVE, UNDULY PUNITIVE AND NOT IN CONFORMANCE WITH THE CODE OF CRIMINAL JUSTICE.

We reverse and remand in part and affirm in part.

### III

The evidence was clear that defendant killed Freyer on August 23, 1998, in Sayreville. They had lived together since March 1996, and became engaged in 1997. In April 1998, they moved together to an apartment in Sayreville.

Defendant and Freyer were having difficulties with their relationship preceding Freyer's death. Their troubles centered around defendant's loss of employment, his drug use and his taking money from Freyer to support his drug use. Freyer was pregnant at the time of her death. Freyer's pregnancy also added a further strain to their relationship.

Two days after Freyer's death, defendant notified her mother that Freyer was pregnant and missing from their apartment. Freyer's mother advised defendant to notify the police, which he did.

Freyer's body was discovered on August 25, 1998, by an individual who was walking in the woods at Bailey Park in Sayreville. The police were notified and subsequently interviewed defendant. At police headquarters, defendant voluntarily provided a tape recorded statement about having reported Freyer missing and said that he had last seen Freyer at 7:00 p.m. on August 24, 1998.

Subsequently, the police interviewed defendant's cousin, George Carty. Carty told police he and defendant smoked cocaine everyday from mid to late August 1998. Carty explained that he had moved into defendant's and Freyer's apartment and that on August 23, 1998, at approximately 10:00 p.m., defendant and Freyer had left the apartment. When they left, they were arguing. Carty told police that defendant returned to the apartment at 11:30 p.m. and said that Freyer was at her father's home. Carty never saw Freyer again. Further, Carty told police that

when defendant returned to the apartment, he had no bruises or scratches and his clothes were not disheveled.

The police officers who interviewed Carty and defendant compared their statements and noticed a discrepancy with respect to the last time defendant saw Freyer. Defendant was then interviewed again. He was given his *Miranda*[1] warnings and voluntarily waived his rights and gave an oral statement to the police.

In his statement, defendant admitted that he had lied about when he had last seen Freyer. He acknowledged that he and Freyer argued over his drug use and the fact that he had lost his job because of his drug use.

He told police that he and Freyer drove to Bailey Park to talk. He acknowledged that they continued to argue and then Freyer "smacked him with an open hand." He said he "grabbed [Freyer] by the neck" with his open right hand and "threw her backwards, causing her to fall down an embankment."

Defendant further told the police that:

He went down to check on her, and he found she was not breathing. He believed that she was dead at that point. He then indicated that he dragged the body by the arms down the hill further to a wooded area, and he covered her up with a cardboard box that was in the area.

He then indicated that he panicked during the situation. He did not know what else to do with her. He also indicated that Carty was not present during this incident.

He further indicated that at no time did he seek medical aid for Lora Freyer, and that he did believe that she was dead at that point. He also indicated that he never returned back to the scene.

Defendant admitted to using Freyer's credit cards after her death.

After defendant's oral statement, he agreed to provide a tape-recorded statement. He was, again, given his *Miranda* warnings. In the taped statements, although defendant admitted that he killed Freyer, he said he pushed her by the neck to get her "to stop smacking [him]." He claimed the contact with Freyer's neck was only a couple of seconds, just "to hold her off [him]." He was

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

unable to say whether he grabbed her neck tightly or loosely, but admitted that his hand went around her neck.

Following defendant's arrest, the police confirmed that defendant had used Freyer's credit card four times after her death, withdrawing $760 from her bank account on August 24, and 25, 1998. All of the withdrawals occurred at the same bank.

On August 26, 1998, the police received Freyer's diary from her mother. The diary detailed Freyer's conflicts with defendant over drugs, money, his lack of employment, his absences from the apartment, and his theft of her credit card to withdraw money from her account. On August 19, 1998, Freyer wrote in the diary that because of defendant's actions, she was going to leave him. A letter that Freyer wrote to defendant, but never mailed, was also found in the diary. In the letter she spoke about their problems and her pregnancy and defendant's "need to get a job to help [her]." Certain portions of the diary and the entire letter were admitted into evidence.

The State produced an expert, Jack Titus, M.D., a forensic pathologist, on the cause of Freyer's death. He testified that Freyer died because of "asphyxiation due to neck compression," or "strangulation."

Defendant did not testify but produced an expert, Arkady Katsnelson, M.D., a forensic pathologist. He concluded that Freyer died from "asphyxiation due to vasovagal reflex." He explained that "a blow to Freyer's neck activated the vagal nerve that caused her heart rate [to] slow down." The slower heart rate caused "the output of blood from the heart [to] be much slower," resulting in an insufficient amount of oxygen to the brain. The brain is not able to function without oxygen and the result is death.

## IV

Defendant argues for the first time on appeal that the judge's charge on murder "improperly reduced the State's burden

of proof to a standard lower than beyond a reasonable doubt and thereby violated defendant's rights to due process of law and a fair trial." Because this issue was not raised below, defendant must show that the error was "clearly capable of producing an unjust result." *R.* 2:10–2. The error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971).

■ Plain error asserted in connection with the jury charge is a:

legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.

[*State v. Hock*, 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied*, 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970).]

*See also State v. Jordan*, 147 *N.J.* 409, 422, 688 *A.*2d 97 (1997).

Here, the trial judge initially instructed the jury on murder and the lesser-included offenses of passion/provocation manslaughter, *N.J.S.A.* 2C:11–4b(2); manslaughter, *N.J.S.A.* 2C:11–4b(1); and aggravated manslaughter, *N.J.S.A.* 2C:11–4a. In addition, he charged the jury on the doctrines of self-defense, *N.J.S.A.* 2C:3–4, and imperfect self-defense, *N.J.S.A.* 2C:3–9.

The challenged portion of the charge was given with respect to the murder count only. The judge said:

The nature of the purpose or knowledge with which Mr. Chavies acted towards Ms. Freyer is a question of fact for you, the jury, to decide.

Purpose and knowledge are conditions of the mind. They can not be seen. They can only be determined by inferences from conduct, words or acts.

Sound familiar? It's the third time that I've told you that. Therefore, it is not necessary for the State to produce a witness or witnesses to testify that Mr. Chavies stated, for example, that he intended or his purpose was to cause death or serious bodily injury resulting in death.

It is within your power to find that proof of purpose or knowledge has been furnished beyond a reasonable doubt by inferences which may arise from the nature of the acts and the surrounding circumstances.

Such factors as the place where the acts occurred. Any weapon that was used. The location. Number and nature of the wounds inflicted, and all that was done or

said preceding Mr. Chavies, connected with and immediately succeeding the events leading to the death of Ms. Freyer are among the circumstances to be considered.

*A homicide in itself may permit you to draw an inference, if you wish to, that Mr. Chavies' purpose to take life or cause serious bodily injury resulting in death.*

*If you are satisfied beyond a reasonable doubt that Mr. Chavies killed Ms. Freyer, you may draw such an inference from the manner and circumstances of the killing as to his purpose and knowledge.*

[ (emphasis added).]

Defendant did not object to this instruction. This instruction was given to the jury just prior to the time it commenced its first deliberations at approximately 3:36 p.m. on February 8, 2000. The jury deliberated until 4:56 p.m. that day. The jury was discharged at that time for the day and told to return the next day to resume deliberations.

The same charge, however, was given on two more occasions to the jury, without objection. The next morning, February 9, 2000, the jury requested further instructions on murder and the lesser-included offenses. The judge recharged the jury at 10:55 a.m. He repeated the above instruction.

Thereafter, in the afternoon of February 9, 2000, the jury sent the following note to the judge: "Dear Judge, we are a hung jury. The decision is eleven to one. No further evidence will convince the lone juror. Please advise." After speaking with counsel and concluding that the jury deliberations had not been lengthy at that point, the judge instructed the jurors about their duties in accordance with *State v. Czachor*, 82 *N.J.* 392, 413 *A.*2d 593 (1980) [2], and sent them back to resume their deliberations. At 4:05 p.m. that same day, the jury again sent a note to the judge that said, "please list the three components of Murder and Aggravated Manslaughter." The jury was dismissed for the day to accommodate a personal obligation of one of the jurors, with the judge to address the jury's question the next day.

---

[2] *Czachor,* sets forth the appropriate instruction to be given to a jury in a criminal case in the event of a deadlock.

The following morning, February 10, 2000, the judge addressed the jury's question and repeated his charge on murder and the lesser-included offenses. Again, the judge instructed the jury in accordance with the presently-challenged instructions noted above. Two and one-half hours after receiving this instruction for the third time, the jury convicted defendant of murder.

We recognize, when reviewing an alleged error concerning the charge, "that portions of a charge alleged to be erroneous cannot be dealt within isolation but the charge should be examined as a whole to determine its overall effect." *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A*.2d 608 (1973). In doing that, we are satisfied that the challenged charge was "clearly capable of producing an unjust result." *R.* 2:10–2.

 On three separate occasions, the jury was essentially told that "a homicide in itself" would allow the jury to conclude that defendant murdered Freyer. This is an incorrect statement of our law. Homicide is "[t]he killing of one person by another." *Black's Law Dictionary* 739 (7th ed.1999). "The legal term for killing a man, whether lawfully or unlawfully, is homicide. There is no crime of 'homicide.'" *Ibid.*

Further, our criminal code defines criminal homicide as "murder, manslaughter or death by auto." *N.J.S.A.* 2C:11–2b. If the trial judge's instruction was a correct principle of the law, then our code's definition of homicide would have required him to charge the challenged instruction with respect to the lesser-included homicide offenses, which he did not do.

 Here, there was sufficient evidence to support a charge of self-defense. Self-defense that results in a death is a homicide but it does not allow a jury to infer that the actor committed a murder. Self-defense, if proven, is a justifiable homicide for which there is no criminal liability. *See N.J.S.A.* 2C:3–4.

Defendant's self-defense claim makes the instruction here even more problematic. Defendant conceded that he committed a "homicide," but did so in self-defense. The instruction permitted

the jury to infer from the homicide itself defendant's purposeful or knowing state of mind even if the jury was in doubt about whether other facts established the requisite element of murder. We also note that the erroneous instruction could have had a great impact on the jury's ability to reach a verdict on one of the lesser-included offenses for which there was sufficient evidence warranting instruction on these offenses. We can perceive particularly such an impact on the jury's ability to convict defendant of passion/provocation manslaughter, where the State bears the burden to prove beyond a reasonable doubt that defendant did not kill in the heat of passion. *See State v. Mauricio*, 117 *N.J.* 402, 412, 568 *A.*2d 879 (1990).

The State argues that any error in the charge was harmless because the judge repeatedly told the jury of the State's burden to establish defendant's guilt beyond a reasonable doubt. It also points to the language following the critical language here where the judge said:

> [i]f you are satisfied beyond a reasonable doubt that Mr. Chavies killed Ms. Freyer, you may draw such an inference from the manner and circumstances of the killing as to his purpose and knowledge.

The State argues that this language meant that if the jury was satisfied that defendant killed Freyer, committed a homicide, then it could draw an inference that defendant's purpose was to take a life or cause serious bodily injury, resulting in death from the manner and circumstances of the killing. It argues essentially that this language ameliorates the now challenged instruction. We can reach no such conclusion here, considering the number of times the erroneous instruction was repeated, defendant's defense to the murder charge and the possibility of the jury finding defendant guilty of one of the lesser-included offenses had the jury been instructed properly.

Appropriate and proper charges to a jury are essential to a fair trial. *State v. Burgess*, 154 *N.J.* 181, 712 *A.*2d 631, (1998). Because proper charges are so essential, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." *State v. Afanador*, 151

N.J. 41, 54, 697 A.2d 529 (1997); *State v. Brown*, 138 N.J. 481, 572, 651 A.2d 19 (1994). The charge here constitutes reversible error.

 The overall effect of the challenged charge was to dilute the State's burden of proving each and every element of murder beyond a reasonable doubt. Trial judges must refrain from giving instructions that lessen the State's burden of establishing each and every element of the crime beyond a reasonable doubt. *State v. Biegenwald*, 106 N.J. 13, 41, 524 A.2d 130 (1987). To permit a charge to lessen the State's burden in a criminal case is a violation of the due process clause of the United States Constitution, *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and the long standing rule of law in New Jersey "that antedates any suggestion that the Constitution compels that burden." *Biegenwald, supra*, 106 N.J. at 59, 524 A.2d 130. We therefore reverse defendant's murder conviction and remand for a new trial.

## V

Because we reverse defendant's murder conviction, we address defendant's claim that portions of Freyer's diary and a letter contained therein were erroneously read into evidence. The State argued that the redacted portion of Freyer's diary and a letter written to defendant, but never received by him, should be read to the jury as evidence of Freyer's state of mind. The judge agreed and allowed the reading of this material to the jury. The actual documents were not admitted into evidence.

Our review of the record convinces us that the trial judge erred and the error was highly prejudicial. At defendant's retrial, this material should not be put before the jury.

The portions of the diary and the entire letter were introduced before the jury by an agent of the prosecutor. The dates in the diary testified to were from July 7, 1998 to August 20, 1998. The following colloquy took place at trial:

THE COURT: All right. Ms. Heitmann [prosecutor], as I understand it, Miss Smith is going to read the entry in that notebook which begins on July 7th, is that correct?

MS. HEITMANN: That's correct, Judge.

THE COURT: Would you do so please?

A. Yes, 7/7. "Took car while I was at work and did not tell me until after I was supposed to leave work.

"Called and said he'd pick me up by three. Three o'clock. I waited inside for ten mins., then outside for 45. He did not come and get me. Came home. The car was here. He was outside.

"We started to fight. Did drugs but did not spend any money. I went to sleep and he took the car after he said he wouldn't. I woke up. It was gone, so I called the bank. He had taken $81 for the usual.

"I walked to the bank and took the rest of the—there's a dollar sign out.

"We have bills from three weeks ago that were not paid because he fucked up the money."

Q. Okay. And the next entry is 7/8?

A. Yes, 7/8. "Didn't come back until next day at seven or eight something. Made me give him $60 to get more. Then made me give him $40 more. Did not go to work. Didn't call in or anything. Quit, and now thinks he's going to work this other job."

Q. Read the entry of 7/10, please.

A. 7/10. "Went to bring food back but never came back. Didn't return any phone calls. He better have my car back so I can go to work. Came back later four hours."

Q. Next entry is 7/13.

A. "Was supposed to pick me up from work at two o'clock. Never called me at work. I called the bank. He took out—he took all the money out. Now all the checks will bounce."

Q. Next entry is 7/17.

A. "Said he was washing the car. Asked me if I was going inside. I did, and he disappeared for almost—disappeared for almost four hours.

He knew I needed to be at work at five p.m., but did not get home again. Never returned any of my pages. Still does not have a job."

Q. Okay. I believe there's another entry for 7/17?

A. Yeah, 7/17. "Went out 'for a walk.' Never came back until 3:13."

Q. 7/18.

A. "At 8:23 said he would be back in ten minutes. Something stupid like he was going to, I believe it's Robin's house, cause the door was open. I told him I wanted to go. He said, I know he wasn't coming back."

Q. Next entry is 7/25?

A. 7/25. "I went to work. He had the car and he stole $40 from me. He didn't pick me up from work."

Q. The next entry is 8/6?

A. 8/6. "Did not get me from work. Was stuck there around two, two, 3:40. He knew I had no money but still didn't get me. Didn't call me or anything."

Q. 8/9?

A. 8/9. "My dad asked us to help him move. We went there. I left after 10:30 because I had to go to work. Chris was supposed to come home, however, he didn't come home until eight or nine."

Q. 8/12.

A. 8/12. "Said he was going to get bait and that he'd be gone 25 to 30 minutes. Been gone an hour and a half. Left 11:53."

Q. 8/17?

A. 8/17. "Called before I left work. No answer. Got home, Chris wasn't here. No note or anything. I don't know where he is. He is always doing something. He will never change. Went to N.Y. with cousin. Came home at 9:30 or something. Said he got arrested for drinking in public. Had cousin stay over. I went out."

Q. 8/18?

A. 8/18. "Went out with cousin. Don't know if he's coming back. Never came back or called."

Q. 8/19.

A. "Went to work. Left a note to call. Someone called my work at seven but hung up. Did not hear from him all day. Left message on machine. I know he came here and did drugs but didn't leave a note or anything.

"I think I'm going to leave this weekend because I get paid and should be able to stay somewhere. He made the decision to end this.

"Called, asked to come home. Brought cousin. Been here since."

Q. 8/20.

A. 8/20. "Found out he stole my credit card, pin number and authorized my card. Then lied about it. It was like four hundred something. Went with my dad and told me he'd be right back. Went to get drugs as usual. Then called at my dad and said he was on his way about wasn't."

Q. There's another entry for ⁸⁄₂₀, correct?

A. Yes, 8/20. "Said was getting—

Q. I believe it's cigs?

A.—it looks like C–I–G–S. "Took cousin's car. I said, see you tomorrow. He said yeah, whatever. He didn't come back."

Q. Does that conclude all the diary entries?

A. Yes.

Next, the prosecutor's agent was allowed to read to the jury the letter written by Freyer. The letter said:

"Well, I still can't figure out what is wrong with you. I guess you forgot to call again, but then you get mad when I remind you. In case you're wondering, I write

to you so I don't have to bother to talk to you. I don't know when you are telling the truth or when you're not. Now I'm worried about you because of what you said yesterday.

"As much as I hate you for all the things you do to me, I still don't want anything to happen to you. But I have realized I don't have to blame you anymore because I can leave. I don't have to stay. I get paid Friday, so I can use that check and probably leave.

"You keep telling me you don't want me to go but I can't keep feeling bad for myself because of you. I was going to go out tonight with someone from work but I'm not. I can go out all I want if I leave. So can you. There is no point for me to stay. You don't want to be here with me and you don't want to work. All you want to do is get high. But don't forget, I'm still pregnant and you need to get a job to help me.

I was crying last night but not about you. I'm not going to cry over you any more. I was crying because I realized I don't have to be here. I don't have to let you do this to me. I'll still worry about you while I'm here but I'm not going to cry over you any more.

"If you really do love me and want me to stay, you need to change. No more lies. No more disappearing. You also need to realize I'm pregnant. You should act like you are interested. I feel like you don't care. I feel like you don't care I'm pregnant. I guess if you don't care now, you won't care after the baby is born.

"You did not call me at all yesterday 8/18. I left a note for you to call me at work. You didn't call. I know you were here and you saw the note. It is now seven. I really hope you call me today. I can't believe how much you have hurt me and how much you keep doing it. It has only gotten worse.

"I want to be with you but I can't let you do this to me. You have no respect for me. I would just like to know why you did this to me. If I don't hear from you today, it's over. Don't worry about seeing me or the baby. Not like you care."

The trial judge gave the following instruction to the jury with respect to the diary entries and the letter:

The diary is not offered to prove that the contents of the diary are true. The diary is being proved to show what the state of mind was of Ms. Freyer on the various dates that are reflected in the diary. I wanted to emphasize that point.

Although the instruction did not mention the letter, we presume that the instruction was intended to apply to the letter as well.

The state of mind exception to the hearsay rule provides:

Then existing mental, emotional or physical condition. A statement made in good faith of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

[*N.J.R.E.* 803(c)(3).]

To be admissible as state of mind, the declarant's state of mind must be relevant to an issue in the case. *State v. Downey,* 206 *N.J.Super.* 382, 390–91, 502 *A.*2d 1171 (App.Div.1986); *State v. Prudden,* 212 *N.J.Super.* 608, 613, 515 *A.*2d 1260 (App.Div.1986). Here, Freyer's state of mind was not a relevant issue to be decided by the jury.

The State argued that because of defendant's self-defense claim, Freyer's state of mind was relevant. We reject this position. There was no issue here that Freyer so feared defendant that she was an unlikely aggressor so as to counter defendant's claim to self-defense. *See Downey, supra,* 206 *N.J.Super.* at 391, 502 *A.*2d 1171. If that were so, a recognized exception would make decedent's state of mind relevant. As we observed in *Downey,* "no relevant issue was presented as to the victim's state of mind prior to or at the time of the murder. The important fact here was the state of mind of the defendant, not that of the deceased." *Ibid.* Moreover, the diary entries and the letter were not probative of the issue of defendant's self-defense claim.

Moreover, some of the material in the diary and letter constituted other-crimes evidence, *N.J.R.E.* 404(b), particularly, references to defendant's drug use and stealing Freyer's money. For this type of evidence to be admissible, the following tests must be met:

1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992) (citation omitted).]

Furthermore, the material issue must be genuinely disputed and must "be necessary for the [disputed issues'] proof." *State v. Marrero,* 148 *N.J.* 469, 482, 691 *A.*2d 293 (1997) (quoting *State v. Stevens,* 115 *N.J.* 289, 301, 558 *A.*2d 833 (1989)). When the judge engages in the weighing of the probative value of other-crimes

evidence, it considers whether other less-inflammatory evidence is available to establish the same issue. *Marrero, supra,* 148 *N.J.* at 482, 691 *A.*2d 293.

Here, the *Cofield/Marrero* test is not met. There was already evidence of defendant's drug use and his illegal use of Freyer's credit card before the jury by way of defendant's confession and the testimony of other State witnesses. Therefore, the references to defendant's drug use and stealing Freyer's money in her diary should not have been admitted, nor should they be admitted in any re-trial.

We are also persuaded that the letter, which contained references to Freyer's pregnancy, was highly prejudicial and should not have been admitted. There was evidence of her pregnancy before the jury from defendant's confession and from the State's expert pathologist who performed the autopsy on Freyer. We fail to perceive how this additional evidence of Freyer's pregnancy was relevant to any issue to be decided by the jury. We conclude that such additional evidence on this topic and the other "state of mind evidence" had the capacity to engender in the jury deep sympathy for Freyer.

Further, the judge's jury instruction with respect to the diary and letter was incorrect and inadequate. As to its incorrectness, the judge told the jury that the evidence was not admitted for the truth of the matter asserted. *N.J.R.E.* 803(c)(3) is the exception to the hearsay rule that permits state of mind evidence to be introduced at trial. By definition, an exception to the hearsay rule authorizes the admission of the evidence for the truth of the matter asserted. *See N.J.R.E.* 801(c) and *N.J.R.E.* 802. If evidence is not offered for the truth of the matter asserted, then it is not hearsay, *N.J.R.E.* 801(c), and no exception to the hearsay rule, such as *N.J.R.E.* 803(c)(3), would be needed to introduce the evidence at trial. We wonder, of course, that if the evidence is not being offered for the truth of the matter asserted, then what is its relevance?

Although the prosecutor agreed with the judge that the evidence was not being offered for the truth of the matter asserted, her closing argument belies that position. In summation, she told the jury it had "heard [Freyer's] diary.... The diary is offered, folks, for you to hear what [Freyer] would have told you if she could come here and testify about what she thought was going on in the relationship." Further, the prosecutor reminded the jury about one of the entries in the diary where Freyer noted she found out defendant "stole her credit card pin number and authorized [her] card, then lied about it." These remarks by the prosecutor were followed by reference to the indictment, charging defendant with unlawful use of Freyer's credit card. These references in the prosecutor's summation hardly bespeak of not using the diary and letter for the truth of the matters asserted in those documents.

Finally, on this issue, the judge's charge was inadequate, especially with respect to that part of this evidence that constituted other-crimes evidence. Even if we concluded that the other-crimes evidence was admissible, which we do not, we would still find that error occurred.

> When other-crime evidence is admitted, "the court must instruct the jury on the limited use of the evidence." *Cofield, supra,* 127 *N.J.* at 340–41, 605 *A.2d* 230; *see also Stevens, supra,* 115 *N.J.* at 304, 558 *A.2d* 833. Because of the inherently prejudicial nature of other-crime evidence, the court's instruction "'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" *Cofield, supra,* 127 *N.J.* at 341, 605 *A.2d* 230 (quoting *Stevens, supra,* 115 *N.J.* at 304, 558 *A.2d* 833).
>
> [*Marrero, supra,* 148 *N.J.* at 495, 691 *A.2d* 293.]

The judge's charge here did not satisfy the standard for instructions concerning other-crimes evidence.

## VI

In defendant's third point, he asserts that the judge erred in failing to require the jury to make a specific finding on the hindering apprehension conviction because the count in the indict-

ment was predicated on two different factual circumstances. The State charged that defendant hindered his own apprehension by covering Freyer's body with a cardboard box and reporting her missing thirty-six hours after he knew she was dead.

This point is raised for the first time on appeal. To grant defendant relief, we must conclude that any error in this regard was "clearly capable of producing an unjust result." *R.* 2:10–2. We can reach no such conclusion here. Defendant conceded during summation that both factual predicates had been established.

Further, ordinarily, a general instruction on jury unanimity will be sufficient. *State v. Parker,* 124 *N.J.* 628, 633–35, 592 *A.*2d 228 (1991), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992).

> In some circumstances, however, a general charge on jury unanimity will not suffice. That is so when, for example, "a single crime can be proven by different theories based on different acts and at least two of these theories rely on different evidence, and [when] the circumstances demonstrate a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory." *People v. Melendez,* 224 *Cal.App.*3d 1420, 1433–34, 274 *Cal.Rptr.* 599, 608 (1990).
>
> [*Id.* at 635, 592 *A.*2d 228.]

Because there is no basis here to conclude that a genuine possibility of jury confusion occurred or that different jurors concluded that defendant committed distinct acts, we conclude that the general unanimity instruction was adequate and no reversible error occurred.

## VII

Finally, we address defendant's sentence. Because we reverse defendant's murder conviction, the sentence of life with a sixty-three and three-quarter-year parole bar cannot stand. Defendant argues, however, that NERA does not apply to his murder conviction and cites our opinion in *State v. Manzie,* 335 *N.J.Super.* 267, 762 *A.*2d 276 (App.Div.2000), *aff'd,* 168 *N.J.* 113, 773 *A.*2d 659 (2001).

Our Supreme Court affirmed in a per curiam opinion because the members of the Court were equally divided. The result is that the Supreme Court's decision is binding in *Manzie* only, as it is essentially the law of that case. *See Abbamont v. Piscataway Township Bd. of Educ.*, 314 *N.J.Super.* 293, 300–01, 714 *A.*2d 958 (App.Div.1998), *aff'd*, 163 *N.J.* 14, 746 *A.*2d 997 (1999). The State thus urges that if we affirm defendant's murder conviction, we should disagree with our earlier decision in *Manzie* and hold that NERA applies to defendant's murder conviction.

Because of our reversal and remand, we only address this issue in the event, on retrial, defendant is convicted of murder. If he is convicted of murder, the trial judge shall follow the holding in *Manzie*, and not apply NERA to the conviction.

We also vacate the sentences imposed on defendant's four convictions for unlawful use of a credit card. Defendant was sentenced as if these are fourth degree convictions. They are third degree convictions. *See N.J.S.A.* 2C:21–6h. Accordingly, the sentences imposed are illegal.

## VIII

We reverse defendant's murder conviction and remand for a new trial. We reverse the sentences imposed on defendant's four convictions for unlawful use of a credit card and remand for resentencing. In all other respects, we affirm.