[No. D047175. Fourth Dist., Div. One. Mar. 29, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
GUILLERMO ROMERO, Defendant and Appellant.

**COUNSEL**

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BENKE, J.**—Although the appellant in this case was charged with murder, he was convicted of the lesser included offense of involuntary manslaughter. Apparently, the jury largely accepted appellant's version of events in which the victim, appellant's lover, initiated a violent quarrel and appellant "lost it," grabbed a knife and stabbed the victim six times.

Notwithstanding the fact that the jury seems to have accepted appellant's account of the homicide, on appeal appellant contends the trial court erred in admitting statements attributed to the victim by a third party. In those statements the victim accused appellant of being jealous and of threatening to kill the victim if appellant ever found the victim with another man.

In light of appellant's defense of self-defense, the victim's fears about appellant were relevant. Therefore the victim's statements were admissible under Evidence Code section 1250 and did not interfere with appellant's right

of confrontation. Moreover, because the jury could have found appellant guilty of involuntary manslaughter only if it accepted appellant's version of events, admission of the victim's statement did not prejudice appellant.

Contrary to appellant's arguments, the trial court did not err in the manner in which it instructed the jury on self-defense and the battered person's syndrome. Finally, the trial court did not abuse its discretion in permitting appellant's counsel to discuss self-defense in his opening statement on the condition counsel knew appellant would be taking the stand and in limiting counsel's cross-examination of the prosecution's bloodstain expert.

## FACTUAL AND PROCEDURAL BACKGROUND

There is no dispute that on the evening of February 4, 2003, appellant Guillermo Romero stabbed to death his lover, Felix Antonio Acosta Ramos, in the home they had recently begun sharing. The medical examiner found and identified six stab wounds on Acosta Ramos, four of which were fatal. Wound A, as identified by the medical examiner, was three and one-half inches long and went through the upper lobe of Acosta Ramos's right lung. Wound B was seven inches long and went into the lower lobe of Acosta Ramos's right lung. Wound C went into Acosta Ramos's body from the right to left side, cut the lower lobe of the right lung, the right diaphragm and across the right lobe of the liver. Wound C also transacted large blood vessels. Wound D was a one-and-one-half-inch wound to the back of the right armpit. Wound E was a three-inch wound to the left armpit. Wound F was located on the back of the left shoulder. The medical examiner stated that Acosta Ramos died because the wounds caused internal bleeding, which filled Acosta Ramos's chest cavity with blood.

According to appellant, he and Acosta Ramos had begun dating in 2000 but his romantic relationship with Acosta Ramos ended in January 2003 when Acosta Ramos expressed interest in another man. On the evening of the homicide, Acosta Ramos returned from the gym and appellant told Acosta Ramos that he would need to leave the home in 30 days. According to appellant, Acosta Ramos reacted by calling appellant a "motherfucker," throwing two sodas in appellant's face and spitting in his face. As appellant was wiping the spit off his face, Acosta Ramos reached for a knife and told appellant he could kill appellant and his family, including appellant's young niece Diandra, to whom appellant was especially close. As Acosta Ramos was making these threats, Acosta Ramos was beating the knife on the kitchen table. Acosta Ramos then went into a bedroom and began throwing shoes, keys and sunglasses out at appellant. According to appellant, he was shocked and terrified by Acosta Ramos's conduct and "lost it." Appellant grabbed a knife, went into the bedroom and started stabbing Acosta Ramos. When he

was done, appellant put the knife down on a table, called his sister and told her what had happened. He then called one of Acosta Ramos's former lovers, Robert Ferguson. Ferguson had maintained a close relationship with Acosta Ramos, and appellant felt that Ferguson was like family to Acosta Ramos. Ferguson told appellant to put a towel on Acosta Ramos. When appellant returned to the bedroom, the door was locked and he was unable to get into the room. By this time the police had been called and a police dispatcher called appellant's home and instructed him to leave the home; appellant did as he was instructed and was arrested outside the home.

Appellant was charged with murder (Pen. Code,[1] § 187, subd. (a)) and personal use of a deadly and dangerous weapon in commission of the offense (§ 12022, subd. (b)).

At trial the principal dispute appears to have been over whether appellant or Acosta Ramos was more likely to have been the initiator of the fatal conflict and whether appellant suffered from battered person's syndrome. In support of its theory that appellant was likely to have been the aggressor, the prosecution put on testimony from Ferguson and another one of Acosta Ramos's former lovers, Jose Rios. Ferguson testified that after his romantic relationship with Acosta Ramos ended, he remained friendly with Acosta Ramos and was in fairly regular contact with Acosta Ramos during his relationship with appellant. According to Ferguson, he would frequently drive Acosta Ramos to various destinations and Acosta Ramos commented that he could always be free to look at other men when he was with Ferguson. Acosta Ramos told Ferguson that if he looked at other men when he was with appellant, appellant would get jealous, pinch him or slap him on the leg and tell him to stop looking. Ferguson testified that Acosta Ramos told him that appellant had said he would kill Acosta Ramos if he found Acosta Ramos with another man or knew Acosta Ramos was with another man. According to Ferguson, Acosta Ramos never slammed doors, threw things at him, broke anything in his presence in anger, or threatened to kill him. Ferguson also testified that earlier on the evening he died, Acosta Ramos called Ferguson and asked Ferguson how to administer an injection of testosterone.

Jose Rios had been romantically involved with Acosta Ramos before Acosta Ramos had relationships with Ferguson and appellant. According to Rios the relationship lasted 10 years. Rios testified Acosta Ramos was never violent with him. Rios also testified that he continued to see Acosta Ramos during Acosta Ramos's relationship with appellant and that if appellant called while Acosta Ramos was with Rios, Acosta Ramos would pretend he was at a taco shop, liquor store or gas station rather than with Rios. Acosta Ramos

---

[1] All statutory references are to the Penal Code unless otherwise specified.

told Rios that appellant was a very jealous guy and that appellant would pinch Acosta Ramos on the arm if appellant was looking at someone else.

Appellant testified on his own behalf. According to appellant, Acosta Ramos was volatile and sometimes violent. Acosta Ramos once told appellant that he had chased Ferguson with a knife and that he had killed two people in Mexico. According to appellant, on one occasion, after Acosta Ramos had become angry with appellant, Acosta Ramos tried to jump out of a moving car. On another occasion when appellant was late coming home, Acosta Ramos became angry and put a steak knife up against appellant's throat. On yet another occasion Acosta Ramos became angry with appellant when appellant was late picking up Acosta Ramos from the gym and swung his backpack at appellant. In each of these instances, Acosta Ramos would eventually stop his violent behavior and break down crying.

On one evening in the month before Acosta Ramos was killed, Acosta Ramos came home and insisted appellant eat a burrito Acosta Ramos purchased. When appellant refused, Acosta Ramos chased appellant with a knife into a guest bedroom. Appellant was able to keep Acosta Ramos out of the guest room, where appellant spent the night alone.

Appellant presented a number of witnesses who, in different ways, corroborated his portrayal of Acosta Ramos's volatile personality. Acosta Ramos's physician testified that Acosta Ramos was HIV positive and, in addition to antiviral medications, was being treated with testosterone. The physician testified that Acosta Ramos had been given 200 milligrams of testosterone on January 27, 2003, and that if Acosta Ramos injected himself with additional testosterone on the evening of February 4, 2003, he would have taken too much testosterone. According to the physician, excess testosterone could cause a person to become agitated and angry.

Appellant also called one of the police officers who responded to the crime scene. The officer testified that on the evening of Acosta Ramos's death, Ferguson told the officer that appellant had called him, and in addition to telling Ferguson that he had stabbed Acosta Ramos, appellant told Ferguson: "You know how violent he gets when he gets mad." Ferguson further stated that he acknowledged appellant's comment. The officer then asked Ferguson if Ferguson had ever had problems with Acosta Ramos. Unlike his testimony at trial, on the evening of Acosta Ramos's death, Ferguson told the officer that Acosta Ramos chased Ferguson with a knife on three separate occasions.

A psychologist who had known appellant and his family for 25 years testified that appellant was very close to his niece Diandra. The psychologist also testified that he had never seen appellant act violently.

One of appellant's coworkers testified that on one occasion he went bike riding with appellant and Acosta Ramos and that Acosta Ramos began screaming at appellant when they were putting their bikes in Acosta Ramos's car. Acosta Ramos was worried that appellant would scratch his car. The coworker did not think appellant was going to damage the car and testified that Acosta Ramos's behavior did not seem normal. According to the coworker, appellant remained quiet, stepped back and let Acosta Ramos load the bikes into the car.

The coworker testified to a second odd incident, which occurred in November 2002, three months before Acosta Ramos's death. Following some volunteer work in which the three participated, they went to breakfast. The waitress brought Acosta Ramos the wrong order. After the waitress took the order and apologized, Acosta Ramos took his knife and began pounding it on the table while staring at appellant. Appellant remained quiet; the coworker thought to himself that Acosta Ramos should have been mad at the waitress and not appellant.

The coworker witnessed a third incident, which occurred in the summer of 2002. Appellant and the coworker were outside appellant's residence when Acosta Ramos drove up and began screaming at appellant for not answering his phone. Appellant pointed out that the coworker was present; Acosta Ramos looked at the coworker, asked him how he was and shook his hand. Appellant told Acosta Ramos that he would call him later; Acosta Ramos walked back to his car, slammed the door, made a U-turn and "peeled out." When the coworker asked appellant what was wrong with Acosta Ramos, appellant said Acosta Ramos was just concerned about appellant. The co-worker thought Acosta Ramos had a temper and that he could control appellant by just looking at him.

One of appellant's neighbors also testified. The neighbor testified that he thought Acosta Ramos was very jealous and had a temper. In particular, the neighbor noticed looks which Acosta Ramos gave appellant and sensed Acosta Ramos was uncomfortable about appellant spending time with the neighbor.

Appellant's younger sister also testified. She stated appellant was very close to her daughter Diandra and had helped raise her. According to appellant's sister, appellant was very much a father figure to her daughter and took her to softball games and attended her school events. Appellant's sister also testified that on the day Acosta Ramos was killed, appellant had come over to the home she shares with her father and siblings and had lunch with the family. At lunch appellant told the family Acosta Ramos had disclosed his HIV status during a recent argument and that he and Acosta Ramos had

frequent arguments in which Acosta Ramos was verbally and physically abusive. Appellant told his family he could not live that way. Appellant's sister told appellant he should tell Acosta Ramos he had 30 days to move out of their home. Appellant went to a movie with his sisters and afterwards seemed to be in a good mood.

A second psychologist testified on appellant's behalf. The psychologist had interviewed appellant and administered psychological tests on him. The psychologist concluded that appellant suffered from battered person's syndrome and posttraumatic stress disorder.

In its rebuttal case the prosecution offered a bloodstain expert who opined that appellant's description of the stabbing was not consistent with the blood found on him or in the home. Appellant's counsel tried to impeach the expert with evidence the expert's opinions in an earlier and locally notorious murder case had been subject to serious dispute. The trial court sustained the prosecution's objection to such impeachment; the trial court found that appellant's effort to attack the expert's opinion in the earlier case would consume an undue amount of time.

The trial court instructed the jury on, among other matters, self-defense, the battered person's syndrome and the prosecution's burden of proof. The trial court refused alternative self-defense and battered person's syndrome instructions offered by appellant.

The jury returned a verdict of involuntary manslaughter and found true the allegation appellant had used a deadly and dangerous weapon in commission of the offense.

## DISCUSSION

### I

In his principal argument on appeal, appellant argues that the trial court erred in permitting Ferguson to testify that Acosta Ramos had told him that appellant would kill him if he found him with another man or knew that he had been with another man. We find no error.

### A. *Evidence Code Section 1250*

Evidence Code section 1250, subdivision (a), states in pertinent part: "Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement

of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant." Evidence Code section 1252 in turn provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

Here in his opening statement appellant's counsel stated: "And Guillermo is saying: He will not hurt my family. He grabs a knife from the counter, and he goes in, and he stabs him. That's what happened. The evidence will show, and he will tell you: I was trying to protect my family. I didn't know if he was going to kill me or kill my family or Diandra.

"Then I go and I call, because I'm confused. I call my home, and Nancy answered the phone, and I said: Nancy, I just stabbed Tony. It was self-defense. He was going to hurt my family. He was going to hurt Diandra. It was self-defense."

"The evidence will show, ladies and gentleman, that Mr. Romero has worked through his life, his adult life; that he has no blemish on his record, some college background, some college courses; and that this man is here today to cause—he believes that what he did was in defense of the harm that was going to come to him and his family."

In light of appellant's reliance on self-defense, his victim's statements about threats appellant made were clearly admissible under Evidence Code section 1250. (See *People v. Spencer* (1969) 71 Cal.2d 933, 945–946 [80 Cal.Rptr. 99, 458 P.2d 43]; *People v. Atchley* (1959) 53 Cal.2d 160, 171–172 [346 P.2d 764]; see also *People v. Lew* (1968) 68 Cal.2d 774, 778–779 [69 Cal.Rptr. 102, 441 P.2d 942].) As the court in *People v. Spencer* stated in a case where, as here, the victim had related the defendant's threats to a third party: "The issue of self-defense had been raised by defendant both at the preliminary hearing, the transcript of which was made part of the evidence at trial, and by defense counsel's opening statement to the court. It was thus proper for the People to introduce evidence that defendant was the aggressor. Reasonably interpreted, Emily's statement that 'I might get killed over it . . . .' expresses her fear that defendant might become violent once Emily broke up with her. From this fear it could be inferred that Emily was not the aggressor and that in fact defendant attacked Emily. As we said in *People v. Lew, supra,*

68 Cal.2d at page 779: 'Or had defendant claimed self-defense, he would have placed Karen's [the victim's] state of mind at issue since a claim of self-defense requires the trier of fact to find that the other party was the aggressor, the prosecution, through rebuttal testimony, could have shown that *Karen was apprehensive and not likely to be aggressive*. Her fear would then have been a factor properly before the factfinder in its deliberations on the defendant's claim of self-defense.' (Italics added.) [Citation.]" (*People v. Spencer, supra,* 71 Cal.2d at pp. 945–946, fns. omitted.)

Admittedly, a statement is not admissible under Evidence Code section 1250 if it was made under circumstances indicating that it is not trustworthy. (Evid. Code, § 1252; *People v. Spencer, supra,* 71 Cal.2d at p. 946.) In *People v. Spencer* the court found nothing which undermined the trustworthiness of the victim's statement when it was made in a natural manner and under circumstances where the victim did not have any apparent motive to lie. (*Ibid.*) Here, Acosta Ramos's statements appear to have been entirely spontaneous and in the company of someone Acosta Ramos was comfortable with and trusted. Thus, as in *People v. Spencer* there does not appear to be anything in the record which undermines the trustworthiness of Acosta Ramos's statement to Ferguson.

As we indicated at the outset, even if the trial court erred in admitting Ferguson's statements, the record is clear the admission did not prejudice appellant's defense. Under appellant's own version of events, he was not entitled to an acquittal. According to appellant, appellant "lost it," picked up a knife and went into the bedroom after Acosta Ramos. The physical evidence showed that appellant then stabbed Acosta Ramos six times, inflicting four fatal wounds. Thus, even in the absence of Ferguson's testimony, the undisputed record demonstrated in a fairly convincing fashion that appellant clearly could have left the home before beginning his sustained and overwhelming attack on Acosta Ramos. Accordingly, even if the trial court had excluded all or part of Ferguson's testimony, the jury could not have reasonably concluded that it was necessary under the circumstances for appellant to use deadly force in order to avoid death or great bodily injury. (CALJIC Nos. 5.12 & 5.13; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [56 Cal.Rptr.2d 142, 921 P.2d 1].)

Because even absent Ferguson's testimony, acquittal was not reasonably possible, the jury was left with the alternatives of finding appellant guilty of murder, voluntary manslaughter or the least serious form of homicide, involuntary manslaughter. In finding appellant guilty of involuntary manslaughter, rather than the more serious offenses of murder or voluntary manslaughter, the jury was required to accept appellant's testimony that he genuinely, if unreasonably, believed Acosta Ramos was a threat to him. The

imperfect self-defense the jury adopted required that the jury largely reject the prosecution's version of his relationship with Acosta Ramos and accept his testimony that Acosta Ramos's repeated physical and emotional abuse led him to genuinely, but unreasonably, fear for his life and the safety of his family. That conclusion required the jury either disbelieve Acosta Ramos's statement to Ferguson or discount it as having no impact on the events that transpired on the evening Acosta Ramos was killed. Thus, in light of appellant's conviction for involuntary manslaughter and the potential theories under which appellant could be acquitted of the two greater forms of homicide, admission of Ferguson's testimony about Acosta Ramos did not prejudice appellant.

## B. *Confrontation Clause*

In related arguments, appellant contends admission of Ferguson's testimony about Acosta Ramos violated his right to confrontation under the Sixth and Fourteenth Amendments to the Constitution and that his counsel was ineffective in failing to raise a confrontation clause objection. We find no violation of the confrontation clause and hence no failure by counsel to adequately represent appellant.

While the court in *Crawford v. Washington* (2004) 541 U.S. 36, 53–54, 68–69 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), held that the confrontation clause bars admission of "testimonial hearsay" when the declarant is unavailable as a witness, recently, in *People v. Giles* (2007) 40 Cal.4th 833 [55 Cal.Rptr.3d 133, 152 P.3d 433] (*Giles*), the court held that where the defendant has killed the hearsay declarant, the defendant has forfeited his right to raise a confrontation clause objection. In *Giles* the victim made a statement to a police officer who was responding to a domestic abuse call several weeks before the defendant shot her. The court held that the defendant could not kill the declarant and then claim he could not confront her. The court stated: "Here, there were no eyewitnesses to the fatal shooting; defendant and the victim were the only ones present. Defendant testified at trial and admitted shooting the victim, but claimed he had acted in self-defense. He claimed that the victim was very jealous of other women, and was a violent person who had previously shot a man, threatened people with knives, and vandalized his home and car on two separate occasions. When describing some of these prior acts, defendant repeated statements allegedly made by the victim. Defendant testified that the victim told him she had shot a man during an argument. He further testified that, during two prior aggravated assaults, the victim declared that she wanted to 'check that bitch' on one occasion, while on the other she asserted that she wanted 'to kill that bitch.'

"In relating his version of the fatal events in this case, defendant again repeated statements allegedly made by the victim. He testified that they had had a 'typical' argument earlier that day. The victim knew defendant was with his new girlfriend, and said she was on her way there to kill her. When she arrived, she threatened to kill both defendant and 'that bitch.' Afraid she had something in her hand, defendant shot at her several times after she 'charged' him. Thus, partially through the victim's own alleged statements, defendant portrayed her as a violent, aggressive, foulmouthed, jealous, and volatile person.

"Defendant now argues that admission of the victim's extrajudicial statements to the police, which conflicted with his portrayal of the victim as the aggressor, violated his confrontation rights. Defendant should not be able to take advantage of his own wrong by using the victim's statements to bolster his self-defense theory, while capitalizing on her unavailability and asserting his confrontation rights to prevent the prosecution from using her conflicting statements. 'A defendant cannot prefer the law's preference [for live testimony over hearsay] and profit from it . . . while repudiating that preference by creating the condition that prevents it.' [Citation.]" (*People v. Giles, supra,* 40 Cal.4th at pp. 849–850.)

The facts in this case are indistinguishable from the circumstances considered in *Giles.* There were only two witnesses to Acosta Ramos's death: appellant and Acosta Ramos. As in *Giles,* appellant admitted killing the victim but attempted to use the victim's own prior statements to establish his claim of self-defense. Under these circumstances appellant forfeited his right to raise a confrontation clause objection to Acosta Ramos's statement to Ferguson. (*People v. Giles, supra,* 40 Cal.4th at p. 837 et seq.)

Because admission of Acosta Ramos's statement did not violate the confrontation clause, any objection would have been overruled. Thus counsel's failure to raise the objection did not deprive appellant of the effective assistance of counsel. (*People v. Price* (1991) 1 Cal.4th 324, 387 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

It bears noting that any error on the part of counsel in failing to raise a confrontation clause objection was not prejudicial, even under the stricter standard applied to constitutional errors. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 70, 587 S.Ct. 824].) As we have discussed, in light of appellant's own description of the stabbing and the physical evidence, no reasonable jury would have found that the homicide was justified.

## II

Defense counsel proposed instructions on self-defense and the battered person's syndrome. The trial court rejected the instructions on the grounds the instructions it gave on those subjects were adequate and, in the case of appellant's proposed battered person's instruction, on the additional grounds that the proposed instruction was an inaccurate statement of the law. We agree with the trial court.

### A. *Self-defense*

The trial court instructed the jury with CALJIC No. 5.12 (Justifiable Homicide in Self-Defense) and CALJIC No. 5.13 (Justifiable Homicide—Lawful Defense of Self or Another).[2] In addition, the trial court gave the jury CALJIC No. 5.15: "Upon a trial of a charge of murder, killing is lawful if it was justifiable. The burden is on the prosecution to prove beyond a reasonable doubt the homicide was unlawful, that is, it was not justifiable. If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty."

Appellant asked that the trial court give the following instruction: "The burden is on the state to prove beyond a reasonable doubt that Guillermo Romero did not act in self-defense or defense of another. You must be satisfied beyond a reasonable doubt that he was not acting in self-defense or defense [of] another before you may convict him. If from all the circumstances of the case you have a reasonable doubt whether Guillermo Romero was acting in self defense or defense of another, you must give him the benefit of the doubt and find him not guilty."

---

[2] The self-defense instructions the trial court gave were as follows: "The killing of another person in self-defense is justified and lawful when the person who does the killing actually and reasonably believes: One, that there is imminent danger that the other person will kill him or cause him great bodily injury; and two, that it is necessary under the circumstances for him to use in self-defense force or means that might cause the death of another person for the purpose of avoiding death or great bodily injury to himself.

"A bare fear of death or great bodily injury is not sufficient to justify homicide. To justify the taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone.

"The danger must be apparent, present, immediate, and instantly dealt with, or must so appear at the time to the slayer as to a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save oneself from death or great bodily harm.

"Homicide is justifiable and not unlawful when committed by any person in the defense of himself and/or his family if he actually and reasonably believed that the individual killed intended to commit a forceful and atrocious crime and that there was an imminent danger of that crime being accomplished. A person may act upon appearances whether the danger is real or mere[ly] apparent."

The trial court properly refused appellant's burden of proof instruction as duplicative of what was covered in the self-defense and burden of proof instructions the trial court gave. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1143 [248 Cal.Rptr. 600, 755 P.2d 1049]; *People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Catlin* (2001) 26 Cal.4th 81, 152 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

### B. *Battered Person's Syndrome*

The trial court instructed the jury on battered person's syndrome with a modified version of CALJIC No. 9.35.1, as follows: "Evidence has been presented to you concerning battered person's syndrome.

"This evidence is not read and not to be considered by you to prove the occurrence of the act of the abuse which form the basis of the crime charged.

"Battered person's syndrome research is based upon an approach that is completely different from the approach you must take to this case."

"The syndrome research begins with the assumption that physical abuse has occurred, and seeks to describe and explain common reactions of it to that person through that experience. To distinguish from that research approach, you are to presume that the defendant is innocent, that the people have the burden of proving guilty beyond a reasonable doubt.

"You should consider this evidence for a certain limited purpose only, namely, that the defendant's reactions, as demonstrated by the evidence, are consistent with him having been physically abused, or the beliefs, perceptions or behavior of victims of domestic violence, or proof relevant to the believability of the defendant's testimony, or whether the defendant committed the crime of murder, voluntary or involuntary manslaughter, or whether the defendant actually believed in the necessity to use force to defend himself against imminent peril to life or great bodily injury, and, if so, whether that belief was unreasonable.

"In assessing reasonableness, the issue is whether a reasonable person in the defendant's circumstances would have seen the threat of imminent injury or death, and not whether the killing of the alleged abuser was reasonable in the sense of being an understandable response to ongoing abuse. An act which appears to be an understandable response is not necessarily an act that is reasonable under the circumstances."

This instruction was consistent with Evidence Code section 1107, which provides in pertinent part: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.

"(b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on intimate partner battering and its effects shall not be considered a new scientific technique whose reliability is unproven. [¶] . . . [¶]

"(d) *This section is intended as a rule of evidence only and no substantive change affecting the Penal Code is intended.*" (Italics added.)

Notwithstanding the trial court's use of CALJIC No. 9.35.1, appellant asked that the trial court give the following battered persons instruction: "A person who suffers from battered person's syndrome has a greater sensitivity to danger than does the ordinary person. As a result, a person who suffers from battered person's syndrome is justified in acting more quickly and taking harsher measures for his protection in the event of assault either actual or threatened, than would a person who is not subject to battered person syndrome.

"Evidence has been received in this case that the defendant suffers from battered person's syndrome and has a greater sensitivity to danger. If you believe that the defendant has a greater sensitivity to danger, and because of such sensitivity, had reasonable cause to fear greater peril in the event of an altercation with Tony Acosta Ramos, you are to consider such sensitivity in determining whether the defendant acted reasonably in protecting his life or bodily safety."

Later, appellant's counsel asked that the version of CALJIC No. 9.35.1 be modified to read: "In assessing reasonableness—in the last paragraph—the jury must consider all the facts and circumstances that might be expected to operate on the defendant's mind to determine whether a reasonable person in defendant's circumstances would perceive a threat or imminent injury or death . . . ."

■ As the People point out, both of appellant's proposed instructions were defective. Evidence Code section 1107 did not alter the nature of self-defense when the defendant is a battered person within the meaning of the statute. "[W]e are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard . . . . Evidence Code section 1107 states 'a rule of evidence only' and makes 'no substantive change.' [Citation.] The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but *the ultimate question is whether a reasonable person, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm.*" (*People v. Humphrey, supra*, 13 Cal.4th at p. 1087, some italics added.) Both of appellant's proposed battered person's instructions suggest precisely the principle which the court in *People v. Humphrey* rejected, to wit: that the question the jury faced was whether a *reasonable battered person* was justified in killing Acosta Ramos. Thus the trial court properly refused to give the proposed instructions.

## III

■ " 'The rule is that in an opening statement it is the duty of counsel to state the facts fairly and to refrain from referring to facts which he cannot or will not be permitted to prove.' " (*People v. Ney* (1965) 238 Cal.App.2d 785, 793 [48 Cal.Rptr. 265]; see also *People v. Nelson* (1964) 224 Cal.App.2d 238, 252–253 [36 Cal.Rptr. 385].) As we have noted, the trial court permitted appellant's counsel to refer to self-defense only on the condition that he knew appellant would testify. Because the only people present at the time of the stabbing were appellant and Acosta Ramos, this condition was appropriate. Without testimony from appellant, there would have been no evidence of the circumstances which led to Acosta Ramos's death and hence no evidence to support a finding of self-defense. (See *People v. Ney, supra*, 238 Cal.App.2d at p. 793; *People v. Nelson, supra*, 224 Cal.App.2d at pp. 252–253.)

## IV

■ Finally, appellant argues the trial court erred in preventing him from impeaching the prosecution's bloodstain expert with evidence the expert's testimony in the earlier murder case had been subject to serious dispute. It is axiomatic that a trial court enjoys broad discretion in determining whether the probative value of specific evidence is outweighed by the concerns of undue prejudice, confusion or consumption of time. (Evid. Code, § 352; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Here, the trial court acted well within that discretion in preventing an extensive dispute about all the circumstances surrounding the conclusions the

expert drew in the earlier case and whether they were reasonable under the circumstances and in light of the outcome of that case.

Judgment affirmed.

McConnell, P. J., and Irion, J., concurred.

A petition for a rehearing was denied April 18, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 13, 2007, S151922.